## ARKANSAS SOUTHERN RAILWAY COMPANY *v.* GERMAN NATIONAL BANK.

### Opinion delivered January 20, 1906.

1. BILL OF LADING—ASSIGNMENT.—At common law, the indorsement and delivery of a bill of lading with intention to pass title to the goods therein specified is a symbolic or constructive delivery of the goods themselves, and the carrier, having notice of the assignment, is bound to deliver the goods to the assignee. (Page 487.)

2. SAME—STIPULATION OF DELIVERY TO SHIPPER'S ORDER.—Where a bill of lading stipulates that the goods shall be deliverable to the order of the shipper, the carrier should not deliver except upon production of the bill of lading properly indorsed by the shipper, for such a stipulation is notice to the carrier that the shipper intends to retain in his power the ultimate disposition of the goods. (Page 487.)

3. CARRIER—LIABILITY FOR FREIGHT AT DESTINATION.—A carrier is responsible for freight after its arrival at the place of destination until it is ready to be delivered, and the owner or consignee has had reasonable opportuniity to examine and remove it; and upon termination of his liability as carrier he becomes responsible for the freight as warehouseman. (Page 487.)

4. INTERSTATE COMMERCE—STATUTORY REGULATION AS TO BILLS OF LADING.—Kirby's Digest, § 530, providing that warehouse receipts and bills of lading may be transferred by written indorsement, that the transferee thereof shall be deemed the owner of the property stored, and that no property so stored shall be delivered except on surrender thereof, and § 531, imposing a penalty for violations of the provisions of the preceding section, do not impose any burdens on interstate commerce, but are in aid of it by providing for the enforcement of duties and the protection of rights already existing, and are valid as to such commerce, in the absence of Congressional legislation inconsistent with them. (Page 487.)

5. CARRIER—LIABILITY UNDER BILL OF LADING.—Where a railway company undertook to carry certain bales of cotton, and issued bills of lading to the shipper's order, care of the compress company at the place of destination, its duty as carrier was not discharged merely by delivery of the cotton to the compress company; though it had the right to store the cotton with the compress company with authority and directions to deliver it to the indorsee of the bills of lading, yet if it failed to give such directions, and the cotton was delivered by the compress company to one not entitled to receive it, the railway company would be liable to the indorsee of the bill of lading for the value of the cotton. (Page 492.)

Appeal from Union Circuit Court; JAMES S. STEEL, Judge, on Exchange of Circuits; affirmed.

*Gaughan & Sifford* and *Rose, Hemingway & Rose,* for appellant.

1. Delivery by the railroad company to the compress company designated by the shipper in the bills of lading was a complete compliance with the contract, and released it from further liability. 29 Wis. 611; 2 Am. Rep. 577; 45 Barb. 502; 111 Mass. 163; 9 Barb. 158; 14 Wall. 98; 16 N. Y. 515; 48 Ill. 425; 77 Ga. 376. If freight is not called for at destination within a reasonable time, the carrier may deliver it to a warehouse and relieve itself of further liability. 39 Ark. 487; 1 Denio, 45; 43 Am. Dec. 649; 45 N. Y. 77.

2. The statute relied on by appellee is in conflict with the interstate commerce clause of the U. S. Constitution. 122 U. S. 347; 169 U. S. 314; 174 U. S. 580; 158 U. S. 98; 196 U.S. 194; 24 How, 169; 8 Wall, 123; Judson, Interstate Com. § 7.

3. Lake, who had obtained the bills of lading and, subsequent to the delivery of the cotton, with his knowledge and acquiescence, to the compress company of which he was president and manager, transferred them to appellee, can not be heard to complain that the deliveries were made without the bills of lading. 60 N. W. 583; 66 N. W. 419. Appellee acquired no greater rights than Lake (1) because the bills were spent, past due and dishonored paper (9 M. & W. 647; 69 N. Y. Suppl. 396; 19 La. Ann. 262; 73 Mo. 669; 42 Mo. App. 284); (2) because the shipping directions in the bills were sufficient to put it on inquiry (Tiedeman, Com. Paper, § 295; 4 Cush. 456).

*Smead & Powell* and *Ratcliffe & Fletcher,* for appellee; *Moore & Smith,* of counsel.

1. The object of the bills of lading was not to represent the cotton merely while in transit, but until delivery. Its liability did not end with delivery to the compress company. 123 U. S. 734-755; 111 Ind. 5; 38 Vt. 402; 72 N. Y. 615; 60 Ark. 375; 124 Fed. 975; 29 Pac. 861; 16 N. Y. 518. The railroad company, by the terms of the contract, could deliver only to the order of the shipper. After storing the cotton, the liability of the railroad became that of a warehouseman, and the compress company would be treated as the agent of the railroad. 14 Wall. 98; 123 U. S. 735; 32 Fed. 54; 63 Fed. 393; 111 Ind. 5; 65 N. W. 29; 106 N. Y. 579; 13 Mo. App. 263; 71 Mo. 203; 29 Pac. 861. The

clause in contract limiting liability to time of arrival is invalid. 57 Ark. 112; *Ib.* 127; 60 Ark. 104; 24 S. E. 166. If appellant could divest itself of further liability by delivery to the compress company, it was required to deliver for account of holder of the bills of lading, and failure to do so would make it liable. 33 S. W. 521; 72 N. Y. 615; 15 N. E. 782; 16 Mich. 493; 33 N. Y. 610; 124 Mass. 503; 22 Ohio St. 324; 51 Vt. 92; 71 N. E. 685; 123 U. S. 723. Bills of lading are made negotiable by written indorsement. Kirby's Digest, § 529. Property named in such bills of lading can not be delivered except on surrender and cancellation thereof. *Ib.* § 530. Company is forbidden to permit the property to be shipped, transferred or removed without written consent of holder of bills of lading. *Ib.* § 527. See, also, 102 N. Y. 120; 23 S. W. 521; 25 S. C. 223; 64 Ark. 169; 55 Ark. 524.

2. The statute is a mere police regulation, protecting holders of bills of lading, and not in conflict with interstate law. 169 U. S. 133; 49 Ark. 291; 93 U. S. 99; 128 U. S. 96; 165 U. S. 628; 163 U. S. 299; 162 U. S. 650; 107 U. S. 38; 156 U. S. 590; 171 U. S. 1; 82 Fed. 839.

3. The right to the bills of lading passed from Bank of Little Rock to appellee. The latter is not required to rely upon the title of Alphin & Lake Cotton Co. 56 Fed. 369; 63 Fed. 391; 66 Fed. 862; 65 Fed. 848; Jones on Pledges and Collateral Securities, § 44 *et seq.*; 32 N. Y. Suppl. 604. See, also, 33 S. W. 521. Appellee had the right to assume that the cotton was in possession of the appellant, and that it would not permit it to pass from its control without taking up the bills of lading. Appellee was not required to make prompt demand or to give notice of transfer of the bills. 102 N. Y. 120; 33 S. W. 521; 14 Wall. 98.

Battle, J. The German National Bank brought an action against the Arkansas Southern Railway Company, to recover the value of cotton on bills of lading issued by the company for the cotton and assigned to the bank; the cotton never having been delivered.

The facts in the case are substantially as follows: Alphin & Lake Cotton Company were dealers in cotton at Little Rock, Arkansas, and were the principal owners of a compress at El Dorado. They purchased cotton at Bernice, La., and at Junction

City, Ark., and at other places along the road of the railroad company. At Bernice the cotton purchased was paid for by the Bank of Bernice and shipped in its name over the railroad of the defendant to El Dorado, a terminus of the railroad, about thirty miles from Bernice. Bills of lading were issued to the shipper in which it undertook to deliver the cotton to shipper's order at its destination. They were forwarded to the Bank of Little Rock with drafts on Alphin & Lake Cotton Company attached for collection. Nine hundred and fifty-one bales of cotton were purchased by Alphin & Lake, and shipped in the name of the Bank of Bernice over defendant's road from Bernice to El Dorado. Bills of lading were issued for all of them, and forwarded to the Bank of Little Rock with drafts attached in the manner indicated.

"Cotton at Junction City was handled very much in the same way, except that the bills of lading showed Alphin & Lake Cotton Company as consignor, and the bills of lading, with drafts for price attached, were forwarded to the Bank of Little Rock.

"When the drafts and bills of lading arrived at Little Rock, Alphin & Lake Cotton Company would draw drafts for the amount on the Bank of Little Rock, which would pay the same by taking up the original drafts for the price of the cotton, and would retain the bills of lading as security for the amounts and all other indebtedness Alphin & Lake Cotton Company owed that bank.

"The bills of lading were all to shipper's order, care of compress, El Dorado, Ark., notify Alphin & Lake Cotton Company. The cotton was usually loaded on the cars before the bills of lading were signed, and usually left the shipping station the same or next day after the bills of lading were signed up, and reached El Dorado within twenty-four hours after it left Bernice, and was delivered to the compress company for account of Alphin & Lake Cotton Company.

"The railroad had no warehouse or place for delivery or storage at El Dorado. It only had a joint track with the St. Louis, Iron Mountain & Southern Railroad Company, and the two roads maintained a joint agent, Hutchinson, at that place. The Arkansas Southern Railroad Company delivered all cotton which came in over its road at the compress. It had no cotton platform, and the compress was the only place it had for the de-

livery of cotton. Before the cotton was delivered to the compress a memorandum was made of it in a little book by the railroad, showing the initial and number of the car, the number of bales in the car, and the place of shipment. The cotton was checked up by Mr. Wright, assistant manager of the compress company, and, if found correct, he wrote 'O. K.,' and signed his name on it with the date of his O. K.

"In delivering cotton to the compress company no other directions were given to it than that contained in this little book. Nothing was said about it in any other way. It was just delivered by that little book, and that was all that passed between the parties. It was always supposed to belong to Alphin & Lake Cotton Company by the compress and railroad, and was unloaded at once. All the compress company did was to count the cotton and O. K. the book as to the number of bales. Neither 'S. O.,' meaning shipper's order, nor 'Care of the compress company' was on this little book. 'S. O.' appears to be upon the book now, but was placed there after the cotton was delivered. It was not on the waybill from which the book was made up."

The cotton was treated as belonging to Alphin & Lake Cotton Compress Company, and was delivered without taking up the bills of lading.

"On December 6, 1902, Lake applied to the German National Bank, which advanced $17,806 on bills of lading for 558 bales of cotton, and on December 11 the bank advanced $19,200 on bills of lading for 441 bales, with the understanding that the bills of lading first delivered should also stand for the last advancement. At the time Lake applied for the first advancement, the bills of lading were in the hands of the Bank of Little Rock. He stated that the Bank of Little Rock had required Alphin & Lake Cotton Company to reduce its account, and a draft was drawn by the company upon the bank in favor of the Bank of Little Rock, with the bills of lading attached, which was presented by and paid to the Bank of Little Rock. At the time the advancement for $19,200 was made the bills of lading were the property of the Bank of Little Rock, and Lake was permitted to take them from the Bank of Little Rock to the German National Bank with the understanding that they or the money for them should be returned to the Bank of Little Rock. The German National Bank

issued $10,000 in New York exchange in favor of the Bank of Little Rock, and paid $9,200 in cash, which Lake and Perrie handed to the Bank of Little Rock in lieu of the bills of lading, and the account of Alphin & Lake Cotton Company was credited with $19,200 by the Bank of Little Rock."

The German National Bank lost the cotton. It was delivered to other parties. The bank recovered judgment in this action; and the defendant appealed.

Is appellant responsible for the loss of the cotton?

At common law a bill of lading is a muniment of title to the goods or property therein specified; is a symbol or representative of the goods; "when properly indorsed and delivered, with the intention of passing the title to them, is a symbolic or constructive delivery of the goods themselves;" and, when assigned, the carrier, having notice of the assignment, becomes bound to deliver the goods to the assignee. If the goods, by the terms of the bill of lading, are deliverable to the order of the shipper, the carrier should not deliver except upon production of the bill of lading properly indorsed by the shipper; "for this notice is to the carrier that the shipper intends to retain in his power the ultimate disposition of the goods." *North Pennsylvania Railroad Company* v. *Commercial Bank of Ohio,* 123 U. S. 727, 734, 736; *The Thames,* 14 Wall. 98; Hutchinson on Carriers (2 Ed.), § § 129, 130; Daniel on Negotiable Instruments, § § 1728, 1731.

The responsiblity of the carrier for the goods continues after their arrival at the place of destination, until they are ready to be delivered and the owner or consignee has had a reasonable time and opportunity to examine them and take them away. If they are not called for by the party entitled to them within that time, it is the duty of the carrier to retain them until they are claimed or store them prudently for and on account of their owner. When his responsibility as a carrier ceases, he becomes liable for the goods as a warehouseman. He is responsible, either as carrier or warehouseman, until the goods are properly delivered. The bill of lading is evidence of that obligation. *North Pennsylvania Railroad* v. *Commercial Bank,* 123 U. S. 727, 734, 736; *The Thames,* 14 Wall. 98; *The Titania,* 124 Fed. Rep. 975; *Blumenthal* v. *Brainerd,* 38 Vt. 402.

For the enforcement of these duties and the protection of the

parties in interest, the statutes of this State provide: "Ware-- house receipts given by any warehouseman, wharfinger or other person or firm for any goods, wares, merchandise, cotton, grain, flour or other produce or commodity, stored or deposited, and all bills of lading and transportation receipts of every kind given by any carrier * * * may be transferred by indorsement in writing thereon, and the delivery thereof so indorsed, and any and all persons to whom the same may be transferred shall be deemed and held to be the owner of such goods, wares, merchandise, cotton, grain, flour or other produce or commodity, so far as to give validity to any pledge, lien or transfer given, made or created thereby, as on the faith thereof, and no property so stored or deposited, as specified in such bills of lading or receipts, shall be delivered except on surrender and cancellation of such receipts and bills of lading; provided, that all such receipts and bills of lading which shall have the words, 'Not negotiable,' plainly written or stamped on the face thereof shall be exempt from the provisions of this act." Kirby's Digest, § 530.

And the act further provides: "Any warehouseman, wharfinger, forwarder or other person who shall violate any of the provisions of this act shall be deemed guilty of a criminal offense, and upon indictment and conviction shall be fined in any sum not exceeding five thousand dollars, or imprisonment in the penitentiary of this State not exceeding five years, or both; and all and every person or persons aggrieved by the violation of any of the provisions of this act may maintain an action at law against the person or persons, corporation or corporations, violating any of the provisions of this act, to recover all damages which he or they may have sustained by reason of any such violation as aforesaid, before any court of competent jurisdiction, whether such person or persons shall have been convicted of fraud as aforesaid under this act or not." Kirby's Digest, § 531.

Appellant does not claim that it has delivered the cotton in question in compliance with these statutes, but contends that the statutes are in conflict with the clause of the Constitution of the United States which vests Congress with power to regulate commerce among the States. But they are not in conflict. It is the duty of the carrier to deliver property specified in a bill of lading to the legal holder thereof. The object of the stat-

utes, and the effect, if obeyed, is to enforce this duty and protect the rights of the holder. In the absence of Congressional legislation upon the subject, the State can do so.

In *Western Union Telegraph Company* v. *James,* 162 U. S. 650, the court held that a statute of the State of Georgia, "requiring every telegraph company with a line wholly or partly within that State to receive dispatches on payment of the usual charges and transmit and deliver them with due diligence, under a penalty of $100, is a valid exercise of the power of the State in relation to messages by telegraph from points outside of and directed to some point within the State." The court in construing that statute says: "The statute in question is of a nature that is in aid of the performance of duty of the company that would exist in the absence of any such statute, and it is in no wise obstructive of its duty as a telegraph company. It imposes a penalty for the purpose of enforcing this general duty of the company. The direction that the delivery of the message shall be made with impartiality and in good faith and with due diligence is not an addition to the duty which it would owe in the absence of such a statute. Can it be said that the imposition of a penalty for the violation of a duty which the company owed by the general law of the land is a regulation of or an obstruction to interstate commerce within the meaning of that clause of the Federal Constitution under discussion? We think not."

In *Chicago, Milwaukee & St. Paul Railway Company* v. *Solan,* 169 U. S. 133, it was held that "a statute of a State providing that no contract shall exempt any railroad corporation from the liability of a common carrier, or carrier of passengers, which would have existed if no contract had been made does not, as applied to a claim for an injury happening within the State under a contract for interstate transportation, contravene the provisions of the Constitution of the United States empowering Congress to regulate interstate commerce." The court said: "Railroad corporations, like all other corporations and persons doing business within the territorial jurisdiction of a State, are subject to its laws. It is in the law of the State that provisions are to be found concerning the rights and

duties of common carriers of persons or of goods, and the measures by which injuries resulting from their failure to perform their obligation may be prevented or redressed. Persons traveling on interstate trains are as much entitled, while within a State, to the protection of that State as those who travel on domestic trains. A carrier exercising his calling within a particular State, although engaged in the business of interstate commerce, is answerable, according to the law of the State, for acts of nonfeasance or of misfeasance committed within its limits. If he fails to deliver goods to the proper consignee at the right time and place; or if by negligence in transportation he inflicts injury upon the person of a passenger brought from another State, the right of action for the consequent damage is given by the local law. It is equally within the power of the State to prescribe the safeguards and precautions foreseen to be necessary and proper to prevent by anticipation those wrongs and injuries which, after they have been inflicted, the State has the power to redress and to punish. The rules prescribed for the construction of railroads, and for their management and operation, designed to protect persons and property, otherwise endangered by their use, are strictly within the scope of the local law. They are not, in themselves, regulations of interstate commerce, although they control, in some degree, the conduct and liability of those engaged in such commerce. So long as Congress has not legislated upon the particular subject, they are rather to be regarded as legislation in aid of such commerce, and as a rightful exercise of the police power of the State to regulate rights and duties of all persons and corporations within its limits."

We have made investigation for, and have not found, statutes of Congress upon the subject-matter of sections 530 and 531 of Kirby's Digest. These statutes do not impose any burdens upon interstate commerce, but are in aid of it, to the extent that they provide for the enforcement of duties and protection of rights already existing; and are useful and necessary legislation, and are valid, in the absence of Congressional legislation inconsistent with them. *Railroad Company* v. *Fuller*, 17 Wall. 560; *Gulf, Colorado, etc., Railway Co.* v. *Heff-*

*ley,* 158 U. S. 103; *Nashville, C. & St. L. Railway Co.* v. *Alabama,* 128 U. S. 96.

In *Central of Georgia Railway Company* v. *Murphy,* 196 U. S. 194, cited by appellant, the State statute in question imposed upon the initial or any connecting carrier the duty of tracing freight which had been lost, damaged or destroyed on its or connecting carrier's line, and of informing the shipper, in writing, when, where, how and by which carrier it was lost, damaged or destroyed, and of giving the names of the parties and their official position, if any, by whom the truth of the facts set out in the information can be established; and provided, that "if the carrier to which application is made shall fail to trace said freight and give said information, in writing within the time prescribed, it shall be liable for the value of the freight lost, damaged or destroyed, in the same manner and to the same amount as if said loss, damage or destruction occurred on its line." The court held that statute was a violation of the interstate commerce clause of the Federal Constitution and void. The court, in considering this statute, said: "Without the provisions of the statute in question, the plaintiff in error would not be liable to the shippers in this case, if, without negligence, they delivered the consignment in good condition to the succeeding carrier. This they offered to prove was the case. But, if this statute be valid, this limitation of liability can only be availed of by the railroad company by complying with the provisions. In other words, before it can avail itself of the exemption from liability beyond its own line, provided by its valid contract, the initial or any connecting carrier must comply with the terms of the statute, and must, within thirty days after notification, obtain and give to the shipper the information provided for therein. This is certainly a direct burden upon interstate commerce, for it affects most vitally the law in relation to that commerce, and prevents the exemption provided by a legal contract between the parties from taking effect, except upon terms which we hold to be a regulation of interstate commerce. * * * The effect of such a statute is direct and immediate upon interstate commerce. It directly affects the liability of the carrier of freight destined to points outside the State, with regard to the transportation of articles of com-

merce; it prevents a valid contract of exemption from taking effect, except upon a very onerous condition, and it is not of that class of State legislation which has been held to be rather an aid to than a burden upon such commerce. The statute in question prevents the carrier from availing itself of a valid contract, unless such carrier comply with the provisions of the statute by obtaining information which it has no means of compelling another carrier to give, and yet, if the information is not obtained, the carrier is to be held liable for the negligence of another carrier over whose conduct it has no control. This is not a reasonable regulation in aid of interstate commerce, but a direct and immediate burden upon it." No such objections can be urged against sections 530 and 531 of Kirby's Digest. The statutes in the two cases are wholly unlike.

Appellant failed to deliver the cotton on the surrender and cancellation of the bills of lading issued therefor, and under the statutes of this State is liable to appellee for damages. But appellant insists that, according to the bills of lading, it was to transport the cotton to El Dorado and deliver it to the care of the compress company, and that when it did so it discharged its whole duty, and was thereby relieved of further responsibility. If this contention be correct, the stipulation in the bills of lading by which appellant undertook to deliver the cotton to the order of the shipper was meaningless. According to the stipulation, it could not have delivered the cotton except upon the production of the bills of lading properly indorsed; for this was notice to the carrier that the shipper intended to retain in his power the ultimate disposition of the goods (cotton). The failure of the legal holder of the bills of lading to appear for the purpose of receiving the cotton when it reached its destination did not relieve appellant of further responsibility. But under the contract and the law it had the right to store the cotton with the compress company with authority and directions to deliver it to the person entitled to it upon the production of the bills of lading properly indorsed. Under the contract as shown by the bills of lading, it was relieved of liability on account of the storage, but not of the failure to deliver according to law. See *Midland National Bank* v. *Mo. Pac. R. Co.* (Mo.), 33 S. W. 521, 525.

Judgment affirmed.

McCULLOCH, J., (dissenting.) I do not agree with the majority of the court in holding that the liability of the railway company for the loss of the cotton is established by undisputed evidence, and that the trial court was correct in directing a verdict for the plaintiff. The cotton was consigned to the shipper's order, care of the compress compaany at El Dorado. The railway company complied with the contract by delivering it to the compress company. The language of the contract was, in effect, a selection in advance by the consignee of a place of delivery and a designation of an agent to accept delivery for him. The consignee can not complain because the carrier delivered the cotton at the place and to the agency designated, without requiring a surrender of the bill of lading, nor can the assignee of the consignee complain, unless the statute quoted in the majority opinion prohibits a delivery by the carrier, under the circumstances of this case, without requiring a surrender of the bill of lading. I do not think that the statute in question has any application to the facts.

In the absence of any statute on the subject, it is the duty of a common carrier of freight, either by land or water, when the point of destination is reached, and the consignee fails to call for the property or refuses to accept it, not to abandon it, but to properly store it for the benefit of the consignee; and the carrier may, when it has no warehouse of its own for bulky freight such as cotton, grain and the like, discharge itself from further liability by placing the goods in store with a responsible warehouseman for the benefit of the owner. When thus delivered, the warehouseman so selected becomes the agent and bailee of the owner. The carrier is not bound to provide storage of its own for bulky freight of that character. 2 Rorer on Railroads, p. 1286; *Fisk* v. *Newton,* 1 Denio, 45; *Ala. & Tenn. R. Co.* v. *Kidd,* 35 Ala. 209; *Navigation Co.* v. *Marshall,* 48 Ind. 596; *Merchants Dispatch Co.* v. *Hallock,* 64 Ill. 284.

There is a clear distinction between the duty of a carrier to furnish suitable facilities for loading and unloading freight and its duty in respect to storage of freight after it reaches its destination. The warehouseman so selected being the agent

of the owner, and not of the carrier, the latter is liable to the former for his negligence. The measure of the carrier's duty is in the selection of a responsible and trustworthy warehouseman. If it exercises ordinary care in selecting a warehouseman of known reliability, and delivers the freight to him for the benefit of the owner, it is not responsible for any loss occurring thereafter by reason of the negligence of the warehouseman in delivering the property to the wrong person. Now, the statute in question does not alter this rule of law in anywise. Notwithstanding the statute, a carrier is not bound to provide warehouse room for storage of cotton or other bulky commodity, nor is it compelled to keep the cotton in cars until called for by the holder of the bill of lading. It may still store with a responsible warehouseman, and thereby discharge itself from further liability. In fact, it is a feature of the transportation and handling of cotton, sufficiently notorious for us to take knowledge of, that railroads do not provide warehouses for cotton at points of destination, but that this feature of the business is taken care of by other concerns owning and operating compresses and storage warehouses at intermediate and terminal points. In the face of this universal custom, I can not believe that the Legislature meant to change the established rules of law concerning the duties of carriers in this respect, and to require the carrier of cotton or other bulky freight either to provide at its own expense warehouses for the storage of such freight, or constitute as its agent other warehouseman whom it may select for the purpose. This would be carrying the effect of the statute, in my judgment, far beyond the obvious intention of the lawmakers. It seems to me that by this statute it was only intended to prevent a delivery of the freight except upon surrender of the bill of lading, and that the same duty and responsibilty is imposed upon the warehouseman after the freight passes into his hands for storage. In this case it can not be said that the railway company was guilty of any negligence in the selection of a responsible warehouseman. The compress company is conceded to have been entirely responsible at the time of the delivery of the cotton. It was the only storage place for cotton at that point, and was generally used for compress and storage purposes by all who shipped

cotton to El Dorado. Moreover, the selection was made by the consignor, who was the consignee, and negligence in the selection, if any, would be chargeable to him, and not to the carrier.

But it is contended that the railway company is liable in this case for the loss of the cotton because its agent was guilty of negligence in failing to notify the manager of the compress company of the fact that the cotton had been consigned to shipper's order. The opinion of the majority is, as I understand, based upon this theory.

I am not sure that, under the facts of this case, any duty rested upon the railway company to notify the compress company of the nature of the shipment. The consignee having selected the compress company as his agent to receive and store the cotton, it would seem to have been his duty to give the necessary notice that the cotton was to be held subject to his own order. Be that as it may, however, I think the trial court was clearly in error in directing a verdict, as it was not shown beyond dispute that the agent of the railway company failed to notify the manager of the compress company that the cotton was consigned to shipper's order.

In the first place, this instruction was erroneous because the negligence of the railway company in this regard was not put in issue by the pleadings. The complaint contains no allegation of negligence in this respect. It is simply alleged therein that the defendant received the cotton for shipment, and failed to deliver the same to plaintiff as the holder of the bills of lading, and judgment is asked, on that account, for the value of the cotton. The plaintiff manifestly relied upon the force of the statute in prohibiting a delivery without surrender of the bills of lading, and not upon any negligence of the carrier in delivering to the compress company without notice of the nature of the consignment. The court, in directing a verdict on this question, did so upon a charge of negligence not set forth in the pleadings.

In the next place, the direction was erroneous because the testimony was conflicting as to whether proper notice was given, and it should have been submitted to the jury. The railroad station agent testified that the book from which the manager

of the compress company checked up the cotton and signed receipts for same showed that the cotton had been consigned to shipper's order. The jury would have been justified in finding from this that the manager received information as to the nature of the consignment and that the cotton must be held subject to the shipper's order. It is true that on cross-examination of the witness the plaintiff undertook to discredit this testimony by showing that the letters "S. O.," meaning "shipper's order," appeared written on the book in a different handwriting from that of the other memoranda. The witness admitted that this appeared to be true in some instances, but he does not say when it was written, or that it might have been added after the delivery of the cotton and signing of the memoranda in the book, and, taking the whole of his testimony, the jury might have found from it that the letters "S. O." were a part of the memoranda in the book when signed by the manager of the compress company, and that it conveyed the necessary information to the latter. The manager of the compress company, who received the cotton, was introduced as a witness by plaintiff, and testified concerning the transaction, but he does not say positively that the letters "S. O." were not in the book when he signed it. He merely said that "if it did, I don't remember ever seeing it in there." I think the majority opinion is inaccurate in the statement that the letters "S. O." appear to be upon the book, but were placed there after the cotton was delivered. There was sufficient evidence to go to the jury upon the question of defendant's negligence in delivering the cotton to the compress company without directions or information.

Moreover, the undisputed testimony shows that the compress company and the Alphin & Lake Cotton Company, two corporations, were under the same management. E. H. Lake was the active controlling officer in both, and directed the business affairs of each. He purchased the cotton for the Alphin & Lake Cotton Company, and directed the method of shipment; the cotton was handled by the compress company under his management and direction, and he shipped it out from the compress company. He is the individual who is solely responsible for the diversion of the cotton. Under those circumstances I think it would be a manifest injustice to charge the railway

company with negligence in failing to give information to the compress company of facts which it already knew through the man who was controlling and directing its affairs and business in handling this cotton. At least, it seems to me that this situation was sufficient to go to the jury on the question of negligence; for, if the compress company already knew that the cotton was to be held subject to the shipper's order, the railway company should not be charged with negligence in failing to again give information of that fact, nor could the negligence of the railway company under those circumstances be the proximate cause of the loss of the cotton.

The judgment should, in my opinion, be reversed, and the case remanded.