St. Louis, Iron Mountain & Southern Railway Company *v.* Bankers Surety Company.

Opinion delivered October 12, 1914.

1. Carriers—delivery of freight without bill of lading—bond.— The act of May 23, 1907, providing that a "shipper or consignee" of goods, may secure delivery of the same from the carrier without a bill of lading, upon the giving of a bond, *held* to authorize the giving of a delivery bond in all transportation cases.

2. Carriers—"consignee" defined.—The word "consignee," as used in the act of May 23, 1907, means a person who, under circumstances in which he might be entitled to the delivery of goods transported by a carrier, represents that he is so entitled, and tenders a bond in the statutory form and requests a delivery.

3. CARRIERS—DELIVERY OF FREIGHT WITHOUT BILL OF LADING—BOND—
   LIABILITY.—A carrier delivered freight to one A., representing him-
   self to be entitled to receive the same, without the bill of lading,
   upon A.'s executing a bond to the carrier as provided for by
   the act of May 23, 1907. *Held*, when it later appeared that A. was
   not entitled to a delivery of the goods, the bond became liable to
   the carrier for the value of the same.

Appeal from Pulaski Circuit Court, Second Division;
*Guy Fulk,* Judge; reversed.

### STATEMENT BY THE COURT.

This is an action on a bond given to the St. Louis,
Iron Mountain & Southern Railway Company by the
Brook-Rauch Mill & Elevator Company, as principal, and
the Bankers' Surety Company, as surety, to obtain deliv-
eries of shipments of goods in advance of a surrender of
the bills of lading therefor. The bond, which was in the
penal sum of ten thousand dollars, was conditioned as
follows:

"The conditions of the foregoing obligation are such
that, whereas, shipments of goods and property trans-
ported by said railway company and consigned to or in-
tended for said obligor, frequently arrive at said railway
company's station at Little Rock, State of Arkansas, be-
fore the original bills of lading therefor have been re-
ceived by said principal, and damage, delay and injury
to such goods or property might result if said railway
company should refuse to deliver the same until the orig-
inal bills of lading therefor are surrendered to it; and,
whereas, said railway company, in consideration of the
execution and delivery to it of this bond of indemnity,
and of the promise of said principal to surrender to the
railway company, within a reasonable time after the de-
livery of any such goods or property to said principal,
the original bills of lading covering the same, is willing
to make such deliveries of goods or property to said prin-
cipal, until ten days after the railway company shall give
to the principal a written notice requiring all such deliv-
eries of goods or property to the principal without sur-

render of bills of lading issued therefor to be discontinued at the expiration of said ten days.

"Now, therefore, if said principal shall, within a reasonable time, not exceeding ten days, after the delivery to it of any such goods or property without the surrender of bills of lading therefor, deliver to said railway company the original bills of lading issued for such goods or property which shall have been delivered to said principal (prior to the taking effect of such ten days' written notice) without the surrender of the bills of lading therefor, or shall pay the value of such goods or property to the railway company upon demand, and shall promptly pay to the railway company all transportation, switching and demurrage charges which shall have accrued thereon, and shall fully protect, indemnify and hold said railway company harmless from and against all claims, demands, judgments, loss, cost and expense, including attorney's fees, and fines and penalties, caused by, arising out of, or connected with, the delivery by said railway company to said principal of any property prior to the surrender of the original bills of lading therefor, or caused by the failure of said principal to deliver to said railway company the original bills of lading for any such property so delivered to said principal by said railway company as aforesaid, then this obligation shall be void, otherwise to remain in full force and effect."

The facts, as alleged in the complaint and admitted by the demurrer, are as follows:

On the 21st of October, 1911, the S. R. Washer Grain Company shipped a carload of bulk corn from Atchison, Kansas, to Little Rock, Arkansas, consigned to itself, and received from the initial carrier a through bill of lading. The transportation was to be over the lines of the Missouri Pacific Railway Company and the St. Louis, Iron Mountain & Southern Railway Company, and the bill of lading, in the form known as a shipper's order bill of lading, recited that the corn was to be delivered at Little Rock to the shipper or to its order. The shipment was

intended for the Brook-Rauch Mill & Elevator Co., the principal in the bond.

It was customary in the grain business to consign shipments of grain to the seller's order at the buyer's place of business, take an appropriate bill of lading calling for a delivery to the shipper or its order, endorse on the bill of lading an order to deliver to buyer or its order, attach the bill of lading to a draft drawn on the buyer for the purchase price, and forward the draft with the bill of lading attached to a bank at the place of destination of the shipment, with directions to present the draft to the buyer, and to deliver the endorsed bill of lading to him upon the payment of the draft. This custom was followed in making the shipment in suit. The Brook-Rauch Mill & Elevator Company was the real buyer of the corn; the shipment was intended for delivery to it in accordance with this custom; the car of corn arrived in Little Rock before the bill of lading was received by it; and delivery was made to it at its request, in compliance with the stipulations of the bond given by it to secure deliveries of goods in advance of a surrender of the bills of lading therefor.

After receiving the car of corn, the Brook-Rauch Mill & Elevator Company failed and refused to surrender the bill of lading for it, and likewise failed to pay the draft drawn on it for the price of the corn. The shipper presented the bill of lading to the railway company and demanded the corn or payment of its value. As the railway company could not deliver the corn, it paid its value to the shipper, with the transfer charges advanced by it, and demanded reimbursement from the Brook-Rauch Mill & Elevator Company. The latter refused to pay, and the plaintiff brought suit.

The action involves the value of two other cars of corn, and of eight cars of oats, which were shipped in like manner and with like result. The Title Guaranty & Surety Company, as surety on the bond given to the Insurance Commissioner of the State of Arkansas by the Bankers' Surety Company, was made a defendant.

The surety companies filed a demurrer to the complaint. The demurrer was sustained, the plaintiff refused to plead further, and judgment was rendered in favor of the defendants.

*E. B. Kinsworthy, R. E. Wiley* and *T. D. Crawford,* for appellant.

1.   The payment to the consignor was not a voluntary payment. When appellant paid to the shippers the value of the shipments, it did so in pursuance to its legal obligation to deliver the shipments to the holders of the bills of lading. It is elementary law that a carrier delivering goods to a person not entitled to receive them is liable to the person who is entitled to them for the conversion; and it is immaterial that the delivery was secured by a third person through mistake or fraud, even though the carrier, acting in good faith, was imposed upon by such person. 6 Cyc. 472.

2.   The instrument sued upon is good as a common-law bond, the statute, Kirby's Digest, § § 530, 531, not applying in this case; but if the statute be conceded as applying, the case falls within the act of 1907, p. 861, § § 1 and 2, and the instrument sued upon is a substantial compliance with the statute. 64 Ark. 147; 79 Ark. 459; 97 Ark. 549-553; 76 Ark. 415; 5 Cyc. 755, note 56; *Id.* 751, 752, 756 and note.

*Charles Jacobson* and *Mehaffy, Reid & Mehaffy,* for appellees.

1.   The complaint discloses on its face that the payments made by the appellant to the consignor were voluntary, and made without legal obligation upon its part to pay the same. 64 Ark. 162.

2.   The instrument sued upon is not in compliance with the statutory requirements in such cases, and, the law having made the transaction upon which the bond is based a crime unless the statutory bond is given, it can not be good as a common-law obligation. Kirby's Digest, § § 524-528, 529, 530, 531; Acts 1907, p. 861; 47 Ark. 378-384; 91 Ark. 205; 51 Ark. 153; 56 Ark. 354; 57 Ark. 540;

32 Ark. 619; 4 Pet. 436; 12 Wall. 349; 17 Mass. 281; 5 Ark. 684.

If the instrument is construed to be a statutory bond, the allegations of the complaint do not bring the case within its provisions. The statute must be read in connection with the bond and into its very terms. 40 Ark. 432.

COLEMAN, Special Judge, (after stating the facts). The S. R. Washer Grain Company shipped a carload of corn from Atchison, Kansas, to Little Rock, Arkansas, consigned to itself, and received from the carrier a "shipper's order" bill of lading. The shipment was intended for the Brook-Rauch Mill & Elevator Company, and the consignor drew a draft on that company for the purchase price of the corn, and sent it, with the bill of lading attached, to a bank at Little Rock for collection. Endorsed on the bill of lading was an order to deliver to the elevator company or to its order. The corn arrived in Little Rock before the bill of lading was received, and was delivered to the elevator company, at its request, without a surrender of the bill of lading. The elevator company had executed a bond to the carrier in the penal sum of ten thousand dollars, conditioned that it would surrender the bill of lading within a reasonable time or pay to the railway company the value of the goods. After receiving the corn, the elevator company refused to pay the draft, and the draft and bill of lading were returned to the consignor. The railway company paid the value of the corn to the consignor on its demand, and brought this action against the principal and sureties on the elevator company's bond, alleging that the principal had failed to surrender the bill of lading and had refused to pay the value of the goods.

The act of March 15, 1887, provided that bills of lading should be negotiable, and that the transfer of a bill of lading should operate as a transfer of the title to the property described therein. The same act made it a criminal offense for a common carrier to deliver goods trans-

ported by it without a surrender of the bill of lading therefor. Kirby's Digest, § § 530, 531.

On the 23d of May, 1907, an act was passed which, after reciting in the preamble that "it often happens that the shipper or consignee fails to receive the bill of lading or original receipt, and the goods called for therein can not be delivered on account of the absence of the original receipts and bills of lading, thus causing delay and injury to the goods," provides as follows:

"It shall be lawful for a shipper or consignee of goods to make, execute and deliver to, and the carrier to take and receive a good, sufficient and valid bond in a sum double the value of the goods, conditioned that the shipper or consignee shall, within a reasonable time thereafter, deliver to the carrier the original receipts and bills of lading issued for said goods, or shall pay the value of said goods to the carrier upon demand; and upon the execution and delivery of said good, sufficient and valid bond as aforesaid, it shall be lawful for the carrier to deliver up the said goods to the shipper or consignee, without requiring the immediate surrender of said original bills of lading and receipts, and for so doing the carrier shall not incur the penalty of the law as set forth in chapter 15 of Kirby's Digest."

The bond sued on purports to have been executed under the authority of the foregoing statute. It recites the fact that shipments of goods consigned to or intended for the elevator company frequently arrive before the original bills of lading have been received; and its condition is that if the railway company will make deliveries of goods prior to a surrender of the bills of lading therefor, the elevator company will, within a reasonable time after such deliveries, surrender the corresponding bills of lading, or pay to the railway company the value of the goods.

It is said that the bond is not valid as a statutory bond, because the statute does not authorize the execution of such a bond by any one except a shipper or a consignee, and that the elevator company, under the circumstances of this case, was neither. The argument is based

on the contention that as the corn was shipped to the shipper's order, and the draft drawn on the elevator company for the purchase price was never paid, the title to the corn, evidenced by the bill of lading attached to the drafts, never vested in the elevator company so as to make it the consignee within the purview of the act.

(1) It is true that the statute employs the words "shipper" and "consignee," but it is manifest from the preamble and context of the act that those terms were not used in a qualifying or restrictive sense. On the contrary, the very association of the words is suggestive of their complementary meaning, and indicates a generalization of the persons who are authorized to take advantage of the act. To the ordinary layman, the words *shipper* and *consignee* would seem to encircle all the parties to a transportation contract with whom a carrier has to reckon, and to include some one who would be entitled to a delivery of each particular shipment. This is the popular meaning of the words, and this is apparently the legislative meaning. The Legislature was dealing with a broad commercial subject, and it evinced an intention to handle it in a broad and liberal manner. And the language of the act, interpreted according to its common acceptation, and construed in the light of the manifest purpose of the statute, clearly indicates that the Legislature meant to make no exceptions, but intended to authorize delivery bonds in all transportation cases.

In the case at bar, the elevator company was really the consignee. It had ordered the corn from the grain company, and the shipment was intended for it. The essential character of the transaction was the purchase and sale of the corn. The grain company could have consummated the sale by shipping directly to the elevator company, under a bill of lading requiring delivery to it, but in that event the seller would have had no security for the purchase price. The commercial method of accomplishing the same result, but without extending credit to the purchaser, was to take a bill of lading to the shipper's order, endorse an assignment on it, attach it to a draft

on the buyer for the price of the corn, and send it to a bank with directions to deliver it to the buyer on the payment of the draft. The buyer would be as truly the consignee in the latter case as in the former. The question of title, or of the ownership of the goods, is not involved. It may be important to the parties to the contract of sale, but it is not material to the carrier except as it may aid in identifying the person to whom delivery is to be made.

In *Nebraska Meal Mills* v. *St. Louis S. W. Ry. Co.*, 64 Ark. 169, it was held that a carrier was protected by a delivery to the consignee named in the bill of lading, even though the consignor, without the knowledge of the carrier, had forwarded a draft, with the bill of lading attached, to a bank for collection, and the buyer had failed to pay the draft. The person designated in the bill of lading was still the consignee, so far as the carrier was concerned, though he had not acquired the ownership of the goods, and was not entitled to a delivery of them as against the consignor. The legal effect is not different if the consignor, instead of having the bill of lading made directly to the person to whom delivery is to be made, has it made to itself, and then endorses it to such person. *Chicago Packing & Provision Co.* v. *Savannah, Florida & Western Ry. Co.*, 40 L. R. A. 367. And the endorsee, in that case, would be no less the consignee because he had not paid the draft, than the consignee named in the bill of lading in the Nebraska Mills case, who likewise had not paid the draft. The liability of the railway company for the delivery might be different in the two cases, for it would depend on different questions. But a bond given to induce the delivery would be as liable in the one case as in the other. It would be liable in the first case because the delivery was to the consignee named in the bill of lading. It would be liable in the latter case, because the delivery was to the party to whom the bill of lading had been endorsed, and who represented that it was the consignee. The fact that the draft had not been paid, and that the party was not entitled to a delivery as against the consignor, would not defeat the liability of

the bond in either case. In both cases, the party could obtain the bill of lading by paying the draft, and could then comply with the condition of the bond by surrendering the bill of lading to the railway company. It was to require this very thing that the bond was given. And the maker of the bond, after obtaining the corn, ought not to be permitted to thus reason with himself: "If I pay the draft and become entitled to the bill of lading, I will constitute myself the consignee, and the bond will be valid; but if I refuse to pay the draft, and convert the corn, I will prevent myself from becoming the consignee, and the bond will be void." The validity of the bond, as a statutory bond, ought not to depend on the determination of the obligor. It would not depend on it, unless it should be held that the word *consignee,* as used in the statute, means what the appellees contend it means.

(2) The word "consignee" is not synonymous with the word "owner." It does not even imply ownership or title. *Sturm* v. *Boker,* 150 U. S. 326; *Lyon* v. *Alvord,* 18 Conn. 66-80; *Gillespie* v. *Winberg,* 4 Daly (N. Y.) 318-320. In its commercial sense it means a person to whom goods are shipped, and to whom they are to be delivered. As used in the statute, the term *consignee* means a person who, under circumstances in which he might be entitled to the delivery of goods transported by a carrier, represents that he is so entitled, and tenders a bond in the statutory form and requests a delivery.

(3) When a demand is made for the delivery of goods, the carrier can not know, in the absence of the bill of lading, whether the person making the demand is entitled to a delivery or not. Under the act of March 15, 1887, it is the duty of the carrier to refuse to deliver until the bill of lading is produced and surrendered. If, however, the claimant executes the bond prescribed by the act of May 23, 1907, the carrier may deliver the goods to him, and the bond will be liable if it subsequently develops that he was not entitled to the delivery. The very form of the bond is that the maker will surrender the bill of lading or pay for the goods. In prescribing this form,

the statute clearly recognizes the possibility of a delivery to a person not entitled to it, and its evident purpose is to enable rightful claimants to obtain their goods without delay, and to prevent wrongful claimants from obtaining goods which should go to others without being required to pay the value of them. Any other interpretation would render the statute a useless enactment, and convert the bond into the shadow of an obligation. For, under any other interpretation, if the delivery was made to the right person, the carrier would need no protection, and if it was made to the wrong person, the carrier would have no protection, since a wrongful claimant would not be authorized to make such a bond, and a bond, if executed, would have no validity.

On the face of the bill of lading in this case, the consignor was also the consignee, and a delivery to it would have protected the railway company in the absence of knowledge of a transfer of the bill. On the other hand, the bill of lading might well have been assigned to the elevator company in such a way as to make it the consignee of the corn. It represented to the railway company that it was entitled to have the corn delivered to it, and obtained such a delivery by giving a bond in the statutory form. The condition of the bond was that it would deliver the bill of lading or pay the value of the corn. It has not done either, and, on the face of the complaint, the bond is liable.

It is said that there should be a strict construction in favor of the sureties. The rule would undoubtedly apply to the bond, but it conceded that its terms are broad enough to include the present transaction. The rule, however, would not apply to the act of May 23, 1907, for the purpose of that statute was to restore innocence to an act which was only an offense because it was *malum prohibitum.*

The judgment is reversed, and the cause is remanded to the circuit court with directions to overrule the demurrer to the complaint.

DISSENTING OPINION.

McCULLOCH, C. J.   It is conceded that the liability of
the surety depends upon the solution of the question
whether or not the contract of suretyship falls within the
provision of the statute which authorizes the carrier to
surrender the consignment of freight without surrender
of the bill of lading.   This is so because the surety can not
be held liable if the contract involves the doing of an act
which is prohibited by law and made a criminal offense by
the statute of the State.   The test is, primarily, whether
or not the carrier violated the terms of the statute by
making a delivery of the freight to the elevator company
without surrender of the bill of lading.

The first legislation on this subject was the act of
March 15, 1887, which provides that bills of lading shall
be negotiable unless the nonnegotiability thereof be en-
dorsed on the face thereof, and that it shall be a criminal
offense for a common carrier to deliver goods without
surrender of the bill of lading.

The case of *Nebraska Meal Mills* v. *St. Louis S.
W. Ry. Co.,* 64 Ark. 169, dealt entirely with the ques-
tion of the civil liability of the carrier under this statute,
the question of criminal liability not being involved; and
the court, in construing the statute, held that it was solely
for the benefit of a transferee of the bill of lading where
the freight was consigned by the vendor to the vendee,
and that a delivery to the consignee without surrender
of the bill of lading did not render the carrier liable to
the consignee who had retained possession of the bill of
lading.   Judge RIDDICK, in delivering the opinion of the
court, said: "In this case the appellant could have pro-
tected itself against the failure of the consignee to pay
for the meal by making the consignment to its own or-
der."

In the present case, the shipper resorted to that
method of self-protection and consigned the goods to its
own order.

In *Arkansas Southern Railway Company* v. *German
National Bank,* 77 Ark. 482, the court again passed upon

the terms of the statute, and, in doing so, said: "At common law a bill of lading is a muniment of title to the goods or property therein specified; is a symbol or representative of the goods; 'when properly endorsed and delivered, with the intention of passing the title to them, is a symbolic or constructive delivery of the goods themselves;' and, when assigned, the carrier, having notice of the assignment, becomes bound to deliver the goods to the assignee. If the goods, by the terms of the bill of lading, are deliverable to the order of the shipper, the carrier should not deliver except upon production of the bill of lading properly endorsed by the shipper; 'for this notice is to the carrier that the shipper intends to retain in his power the ultimate disposition of the goods.'"

The General Assembly of 1907, realizing the hardships and inconvenience which might result from strict enforcement of the statute, enacted the statute now under special consideration, which modified to some extent the provisions of the act of 1887. This modification applies only to the criminal feature of the old statute, and leaves the civil liability declared in the old statute entirely unimpaired. The new statute is very simple in its provisions. It merely declares that "it shall be lawful for a shipper or consignee of goods to make, execute and deliver to, and the carrier to take and receive a good, sufficient and valid bond  *  *  *  conditioned that the shipper or consignee shall within a reasonable time thereafter deliver to the carrier the original receipt and bill of lading issued for said goods, or shall pay the value of said goods to the carrier upon demand," and that upon the execution of such bond "it shall be lawful for the carrier to deliver up the said goods to the shipper or consignee without requiring the immediate surrender of said original bills of lading and receipts."

The statute, it will be seen, authorizes a delivery only to the "shipper or consignee." Those terms have a well-known significance, and there should be no doubt or uncertainty about what the lawmakers meant. The whole legislation in this State on this subject relates to receipts

and bills of lading, that is to say, contracts of bailment by warehousemen and contracts of affreightment by carriers which are in writing and capable of being assigned. In speaking of a bill of lading, the lawmakers used terms which are applicable to that kind of a contract, and there can be no doubt about the meaning of the terms "shipper or consignee" when used in such an instrument. The word consignee is defined as "the person to whom goods or other property sent by carrier are consigned or addressed." Century Dictionary. The shipper, within the meaning of the statute, is evidently the person who consigns the goods and is mentioned in the bill of lading as the consignor.

In *M. & L. R. R. R. Co.* v. *Freed,* 38 Ark. 614, this court gave a clear and express definition of the meaning of these terms as follows: "It will simplify the matter to bear in mind when the terms 'consignor' and 'consignee' are used, that by the former is meant a vendor who ships, and by the latter, a purchaser to whom they have been sent." In that case, the court was dealing with the question of the right of *stoppage in transitu,* and after laying down the rule that, according to all the authorities, the right existed only in behalf of the vendor, added the following: "It is the real interest on one side and liability on the other, which gives the right; not the technical designation of the parties in the bill of lading." The last was said with reference to the right of *stoppage in transitu,* which right was held to be entirely in the vendor, and it does not modify the clear definition given by the court of the words consignor and consignee.

Now, the delivery in this case was not to the consignee, and the carrier was not protected by the bond. The shipper consigned the goods to his own order, and therefore was both shipper and consignee. The fact that the bill of lading contained a direction to notify the elevator company did not change in the slightest degree the relation of the parties to the contract of shipment or make the elevator company the consignee within the

meaning of the statute. This is plain under the authorities.

The New York Court of Appeals, in the case of *Furman* v. *Union Pacific Rd. Co.,* 106 N. Y. 579, speaking through Mr. Justice Peckham, said: ''Here is no statement that Zucca Brothers are the consignees. The very presence of the word 'notify,' in its relation to them, shows that they are not intended as the consignees. If they were, the word is wholly unnecessary. It is the duty of the carrier to notify the consignee of the arrival of the goods. To place in the bill of lading a direction to notify a certain person, to whom, if consignees, it was the carrier's duty to deliver, or at least to notify of the arrival of the goods, is a plain notice that (in the absence of further directions) they are not the consignees.''

To the same effect see *Joslyn* v. *Grand Trunk Ry.* 51 Vt. 95, where the court held that a designation of a person as one to be notified did not render him the consignee and authorize a delivery to him.

In one of the cases cited by the majority in their opinion (*Gillespie* v. *Winbery,* 4 Daly 318), it is said: ''Consignor and consignee, in the ordinary mercantile acceptation of these words, signifies the shipper of merchandise and the person to whom it is addressed.'' When the Legislature uses words of well-known signification, the presumption is to be indulged that they use those words with reference to that meaning. Nor does the fact that there was a contract of sale between the shipper and the elevator company, and that the goods were shipped to Little Rock with the intention of delivering the same to the elevator company in consummation of that sale, make the elevator company the consignee within the meaning of the statute. In using the words shipper and consignee, the Legislature evidently meant the persons designated as such in a bill of lading, for that is the sole guide of the parties who deal with it. Only when used in this meaning is it possible for the carrier to ascertain who is entitled to give bond and receive the freight without the surrender of the bill of lading. The delivering

agent of the carrier knows, without inspection of the bill of lading, who the shipper and the consignee are, for that information is given in the way-bill. Any other interpretation of these words leaves it entirely uncertain as to whom a delivery may be made, for if we are allowed to look beyond the terms of the contract itself it necessarily follows that the carrier can deliver to any one who asserts a claim to the property and is willing to give bond as provided in the statute.

The majority are entirely correct, I think, in saying that ''to the ordinary layman the words shipper and consignee would seem to encircle all the parties to a transportation contract with whom the carrier has to reckon.'' They might well have added that not only laymen, but also those who have technical knowledge of those terms would interpret them to mean the parties to the contract as shipper and consignee; but it does not follow, I think, that the use of those terms authorizes a delivery to any person who claims to be the ultimate consignee. They only apply, in my opinion, to the shipper or the consignee designated in the written contract between the parties. The carrier has no other method of designating the consignee except by the terms of the writing itself or by a surrender of the bill of lading which evidences the title to the property.

The views of the majority seem to be predicated upon some notion of commercial methods of handling shipments of this kind; and because there is a custom in the sale of goods of this character to consign to the shipper's own order, that the Legislature must have had such a custom in view and meant to include within the meaning of the word consignee a person to whom the goods are ultimately to be delivered. I think this is a very strained interpretation of the plain language of the lawmakers, and that it is wholly unjustified in construing the statute. We have nothing to do with the policy of the law in permitting deliveries by a carrier to any one who asserts the right to take the property and is willing to give bond in accordance with the statute. The question of

policy is entirely for the Legislature, and we are not justified, I think, in straining the language of the lawmakers in order to establish what may be believed to be a wise policy. I am by no means sure that, even if the court had such power, it is adopting the wise policy in the control of transactions of this kind. It is the custom in dealings of this kind for the shipper to retain control of his property until he sees fit to transfer the bill of lading. The shipper in most instances may and doubtless has good reasons for adopting that method of doing business, and the privilege ought not to be conferred on the carrier, and in my judgment was not intended to be conferred by the Legislature, to deliver the goods to any one who claims the same and is willing to give bond. The contract of sale is, in instances of this kind, executory and the shipper may have good reason for withholding delivery; and the civil liability, which results only as compensation to the extent of the value of the goods, may not in all cases be adequate for the inconvenience or for special damages which may result from the delivery.

I can not bring myself to an agreement with the majority, who say, in the opinion handed down today in a companion case to this (*Chicago, R. I. & P. Ry. Co. v. The Title Guaranty & Surety Co.*), that ''the legislative purpose was not so much to preserve the memorials of rightful deliveries as it was to provide indemnities for wrongful deliveries by requiring false claimants to pay the value of the goods which they have illegally obtained.'' I do not think that the legislative purpose was merely to provide indemnity for wrongful delivery, but the dominant idea of the Legislature was to prevent wrongful deliveries by an imposition of both civil and criminal liability. It was thought that by the enactment of this statute the rigor of the law would be to some extent modified by permitting delivery to a shipper or consignee who, in the absence of an assignment of the bill of lading, would be rightfully entitled to the delivery. The statute was, in other words, passed merely for the convenience of the shipper or consignee so that

in cases of delay of transmission of the bill of lading the person designated in the contract of shipment might give bond and receive the property without waiting for the delayed evidence of title. It was far from the purpose of the lawmakers, it seems to me, to open wide the doors by permitting a carrier to deliver property to anybody who may lay claim to it and is willing to give bond.