St. Louis, Iron Mountain & Southern Railway Company

v. Citizens' Bank of Little Rock.

Opinion delivered June 29, 1908.

1. Carriers—liability on bill of lading.—Where a carrier issues a bill of lading for certain bales of cotton, and surrenders the cotton without taking up its bill of lading, it will be liable for the value of such cotton to an innocent holder of such bill of lading. (Page 28.)

2. Same.—Where, by the negligence of the carrier's agents, two sets of bills of lading were issued upon a certain lot of cotton shipped to a compress, an incoming and an outgoing set, and both sets were acquired by an innocent holder, it is no defense, in a suit by the latter upon the incoming set, that he had already received the proceeds of the outgoing set. (Page 29.)

3. Same—liability upon receipt.—Where a carrier issued bills of lading in lieu of compress receipts, and where it did not ship out all of the cotton called for by a compress receipt issued a due-bill for the excess in the number called for in the compress receipt, such due-bill is a mere receipt, which is impeachable for mistake, error or false statement. (Page 30.)

4. Same—effect of receipt.—As a freight agent is not authorized to issue bills of lading when the goods are not received, a receipt issued by him under such circumstances is not a binding obligation of the carrier, at least until the rights of a bona fide holder of a negotiable bill of lading intervene. (Page 32.)

Appeal from Pulaski Chancery Court; *Jesse C. Hart*, Chancellor; reversed in part.

*T. M. Mehaffy* and *J. E. Williams*, for appellant.

According to the testimony, the bank's method of doing business and of handling this cotton was such as to make it entirely responsible for any loss sustained under the bills of lading. The railway company having delivered the cotton to the com-

press with the assent and knowledge of the bank, it became a complete delivery, and the bank was thereafter responsible only as a warehouseman for the cotton.

*Rose, Hemingway, Cantrell & Loughborough,* for appellee.

No goods shall be delivered on a bill of lading without the written assent of the person holding the bill. Kirby's Dig., § 527. The property described in a bill of lading should not be delivered without the surrender and cancellation of the bill of lading. *Id.* § 529; 77 Ark. 482; 80 *Id.* 601. The carrier's bill of lading is conclusive as against it on the question as to whether the company received the property described in such bill of lading. 19 L. R. A. 74. It can make no difference that Bragg and Swain had no authority to issue the due bill. 79 Ark. 14.

HILL, C. J. This is another chapter in the financial career of the Alphin-Lake Cotton Company. It is an action brought by the Citizens' Bank of Little Rock to recover of the St. Louis, Iron Mountain & Southern Railway Company the value of cotton delivered by it to the cotton company without a surrender of the bills of lading representing said bales. There are 13 counts in the complaint, the first twelve counts for 62 bales and the 13th count for 12 bales. The latter will be considered separately, as it presents a different question.

The transactions involving the loss to the bank of the 62 bales of cotton set forth in the 12 counts were as follows: Various shipments of cotton were made to the Alphin-Lake Cotton Company in the same method as those described in *Ark. So. Ry. Co.* v. *German Nat. Bank,* 77 Ark. 482; that is to say, the shipper delivered the cotton to the railroad company and took a bill of lading consigned to shipper's order. Usually it was in care of the compress company in Little Rock, with directions to notify the Alphin-Lake Cotton Company. In all cases the cotton was delivered to the compress company. The bills of lading for said cotton had been attached to drafts drawn upon the Alphin-Lake Cotton Company by the shipper, and these drafts were paid by the bank, and the amount thereof charged to the Alphin-Lake Cotton Company, and the bills of lading held by the bank as security for the advance thus made to the Alphin-Lake Cotton Company.

The method pursued by the railroad companies, the compress companies and banks in Little Rock in handling cotton, through which was made possible the success of the schemes of the Alphin-Lake Cotton Company, was fully stated in *Cititzens' Bank* v. *Ark. Comp. Co.,* 80 Ark. 601. The evidence in this case as to the cotton customs is the same as in that case. The bank intrusted the Alphin-Lake Cotton Company with the bills of lading whenever the cotton company desired to replace them with compress receipts (or other bills of lading for outgoing cotton) ; and in lieu of the bills of lading thus intrusted to the cotton company would be returned compress receipts, or, in some instances where compress receipts were not returned for all of the cotton called for in the bill of lading, there would be an indorsement made upon the bill of lading by the compress company that certain bales of cotton had been received on transfer receipt, the number of which was given, and the bill of lading would be returned and stand good for the bales not called for by the warehouse receipt. For instance, a bill of lading for forty bales contained an indorsement showing that for 34 of the bales transfer receipts had been issued, which would leave the bill of lading to stand for the six bales for which compress receipts were not issued. In some way, not explained in the evidence, the cotton company got the railroad company to ship out cotton that was represented by these remnants of the bills of lading, and in three instances where there had been no credit upon the bills of lading.

The bank sued for the thirteen bales represented by the three uncredited bills of lading and for 49 bales represented by bills of lading, upon which credits had been indorsed reducing them to that number of bales, which bills originally called for many more bales than the 49, which were the remnants. There can be no doubt of the right of the bank to recover for the thirteen bales of cotton for which it held bills of lading, and which it had not temporarily surrendered for exchange for warehouse receipts, as the decision in *Arkansas Southern Ry. Co.* v. *German Nat. Bank,* 77 Ark. 482, settles every possible phase of the controversy over them. (See also *Arkansas Southern Ry. Co.* v *German Nat. Bank,* 207 U. S. 270, where an interesting review of that case may be found).

There can be no distinction worked out between the actions based on the remnants of the bills of lading and those based on the bills of lading as originally received by the bank. The compress company became the agent of the railroad company for the purpose of taking up its bills of lading and issuing therefor warehouse receipts. Where all of the cotton had not been received by the compress company when the bill of lading was presented to it, or for some other reason, the compress company only issued its receipts for a part of the cotton called for in the bill of lading, and it then indorsed upon the bill of lading a credit for the amount which had been taken up by these receipts, and left the bill of lading outstanding for the bales not called for by the receipt, and this bill of lading was returned to the bank in that condition and held by it as security for the bales of cotton for which it did not get warehouse receipts, and warehouse receipts took the place of the balance originally called for by the bill of lading, and were noted on the bill of lading. When the cotton company received a bill of lading from the bank for the purpose of getting compress receipts in lieu thereof, it was acting as agent for the bank; and, had this loss occurred through its conduct while so acting for the bank, then the bank could not recover herein. But such is not the case. For, in every instance where the cotton company was intrusted with the bill of lading, the same was returned, or compress receipts for the bales called for in it in lieu thereof, or, where credits were made, compress receipts were returned for the amount thus credited; and these matters were checked up by the bank every day, and no shortage was found in this respect. Therefore, it is clear that the limited agency of the cotton company for the bank did not cause the loss herein sued upon.

It was also shown that, of the 62 bales that were shipped out by the railroad company without the surrender of bills of lading, the proceeds of 46 of them went to the Citizens' Bank, the plaintiff in this case. In each of these instances, however, the proceeds went to the bank through collecting a draft attached to an outgoing bill of lading, which bill of lading had been obtained by the surrender of a warehouse receipt which had been taken out of the bank for the purpose of being exchanged for the said outgoing bill of lading, and the draft was placed to the credit of

the cotton company when drawn by the cotton company with said outgoing bill of lading attached; and in this way the bank paid twice for one bale of cotton and received the proceeds thereof from it when the draft attached to the outgoing bill of lading was paid, but left it unpaid for its first advancement when it paid the draft attached to the incoming bill of lading.

There was nothing in the evidence that showed that the bank knew that the cotton was being thus manipulated. So far as the 62 bales of cotton, represented by the unsurrendered bills of lading and the remnants of bills of lading, are concerned, there are no facts to take the case without the principles governing in *Arkansas Southern Ry. Co.* v. *German Nat. Bank,* 77 Ark. 482, *supra,* and to this extent the judgment is affirmed.

The facts in regard to the 12 bales of cotton are as follows: The compress company was in the habit of issuing one receipt for several bales of cotton, instead of issuing separate receipts for each bale of cotton, and would issue a receipt for as many bales as would be called for by the bill of lading. In shipping out cotton, it was necessary, under the custom then prevailing, to get a turnout order. In order that the cotton company might make a shipment, the bank delivered to it, for the purpose of obtaining an outgoing bill of lading, a certain compress receipt calling for a large number of bales of cotton. The cotton company did not ship out all of the cotton called for by said compress receipt, but delivered the compress receipt to the railroad company, and got an outgoing bill of lading for twelve bales less than the amount called for by said receipt, and returned the outgoing bill of lading to the bank, and for the 12 bales called for by the receipt, not in the bill of lading, delivered to the bank a certain receipt or "due bill," as it was called, (which term for the want of a better will be adopted), issued under authority of Mr. A. R. Bragg, Division Freight Agent of the railroad company. This receipt or due bill was as follows: "No. 1, return 12 bales, account Alphin-Lake, Bill of Lading 379, A. R. B., 11-15-02." This was written by Mr. G. W. Swaim, who was bill of lading clerk under Mr. Bragg, and who was impowered by Mr. Bragg to issue such an instrument.

There was a custom existing in the division freight office of issuing bills of lading for compress receipts; and where the

compress receipts called for more cotton than the shipper desired to ship out, the receipt was surrendered, and the freight office would execute a due bill for the excess in the number called for in the compress receipt. These due bills were accepted by the railroad company the same as compress receipts. This custom prevailed in Little Rock, but was not shown to extend beyond it, or that it was known to any officials of the railroad other than the local ones.

The facts show here, as they did in the case of *Cititzens' Bank* v. *Ark. Comp. Co.,* 80 Ark. 601, that the compress receipts were not relied upon to identify particular bales. They represented merely so many bales of cotton, and the identification of the cotton was furnished by the turnout order. The procedure was thus explained by Mr. Justice RIDDICK: "When he (Lake) desired to ship any cotton held by the Compress company, he obtained from the bank receipts for the number of bales he desired to ship, and the compress company would then ship the cotton out on his 'turnout' order upon his surrendering receipts for an equal number of bales, without regard to whether these receipts had been issued or assigned to him or not. For, prior to this litigation, the receipts which the compress company gave for the cotton contained only a meagre description of the cotton, and cotton standing on the books of the warehouse to the credit of one person would be shipped out on the order of such person upon his surrendering receipts issued to him or to any other person for a like number of bales. In other words, the compress company, the banks and cotton dealers dealt with these compress receipts as if they called for no particular cotton, but only for a certain number of bales of cotton."

The testimony shows that the railroad officials redeemed their due bills by issuing a bill of lading for them, just as they would issue a bill of lading for a compress receipt; the identity of the cotton for which the bill of lading was issued not depending in either instance upon the compress receipt (or due bill) itself, as it took both the receipt (or due bill) and the turnout order to identify the cotton shipped.

The bank accepted and retained this due bill in lieu of compress receipts, and now sues the railroad company upon it. Can it recover upon it? It is not a bill of lading. A bill of lading

has a two-fold aspect. It is both a receipt and a contract. 1 Hutchinson on Carriers, § 157; *Pollard* v. *Vinton,* 105 U. S. 7. As a receipt, it is *prima facie* and not conclusive evidence of the facts recited, and between the parties it is impeachable for mistake, error or false statements in it. 1 Hutchinson on Carriers, § 158.

A carrier acts through agents, and is bound by all they do within the scope of their authority; and it is within the scope of their authority to receive goods and issue bills of lading therefor, but it is not within the scope of their authority to issue bills of lading when the goods are not received. 1 Hutchinson on Carriers, § § 159-162.

The statute forbids any warehouseman or carrier to issue any receipt for goods unless the goods shall have been actually received into its possession. Kirby's Digest, § § 524, 532. A delivery of goods to a carrier must be for immediate transportation. If goods are delivered to him to be stored by him for a certain time, or until the happening of a certain event, or until further orders, the carrier becomes a mere depositary or bailee, and his liability only measured by the principles governing that relation, and not as a carrier. 1 Hutchinson on Carriers, § 112 and cases in note 23. Section 530 of Kirby's Digest makes warehouse receipts given by warehousemen for cotton or other commodities, when stored or deposited, and bills of lading or transportation receipts given by carriers, transferable by indorsement, and all persons to whom the same shall be transferred shall be deemed to be the owner of such goods, and the goods shall not be delivered except upon surrender of such warehouse receipt. This section and others in chapter 15 of Kirby's Digest make the warehouse receipt or bill of lading representative, so far as delivery goes, of the commodity itself, and guards and protects the value of such evidence of the commodity by requiring the actual delivery of the commodity before the issuance of the receipt and forbidding the delivery of the commodity without the surrender of the evidence of it. The Legislature of 1907 provided for giving bonds pending the transmission of a bill of lading, which is but another emphasis of the protection which the law affords these evidences of property.

An application of the principles above announced to the

facts at bar brings this conclusion: It was beyond the scope of the freight agent's authority, and contrary to law, to issue a bill of lading or receipt for goods not actually received, and such receipt is not binding, at least before the right of a *bona fide* holder of a negotiable bill of lading intervenes, upon the carrier. There was no cotton actually delivered to the railroad when Mr. Bragg issued the due bill sued on. If the compress receipt which was surrendered when the due bill was issued be taken as an actual delivery of the cotton, yet it was not delivered for immediate shipment, but merely to be held until some further orders were received for it to be shipped out; and in the meantime the railroad company was merely a depositary, and liable only as such for the safe-keeping; and in this instance there was nothing to keep safely other than a mere symbol of the property itself. This symbol was an incomplete one, as the custom required another instrument to identify the cotton in order that the proper bill of lading could be issued therefor. The bank permitted its compress receipt, which represented so many bales of cotton—indeterminate, it is true, but still a given number of bales of cotton in a warehouse—to be surrendered, and accepted in lieu thereof this due bill. The due bill represented nothing tangible; it is a promise to issue a bill of lading, and such a promise is beyond the scope of authority of the agent making it. It is a mere symbol for another symbol; it cannot be binding upon the railroad as a receipt, for no goods were received; it is not a bill of lading, and the statute relating to them cannot apply. It is a promise to give a bill of lading for 12 bales of cotton because the carrier holds a compress receipt for 12 bales, but the carrier's agent cannot bind the carrier by a bill of lading until the goods are actually delivered for immediate shipment. In no view of it is it a binding obligation of the railroad company.

It is said by the appellee that it makes no difference whether Bragg had authority to issue the due bill or not, since the railroad actually got the cotton sued for. They invoke the doctrine of estoppel against a corporation pleading an *ultra vires* act when it has received the consideration for the act—when it is an executed contract. The railroad received this cotton for transportation only, and did not take it as its own, and did not receive any

87—2

benefit other than its freight tolls. It was through some error or rascality that the railroad company was induced to ship it out without surrender of the bill of lading or compress receipt representing it, and that is the foundation of the claim against it. But, as the bill of lading had been surrendered for compress receipts; and compress receipts for this due bill, liability cannot be sustained on such ground, but must rest upon the due bill alone. The railroad company, like the bank, is an innocent victim of the machination of the Alphin-Lake Cotton Company. This is conceded to be a case in which one of two innocent parties must suffer for the misdeeds of a "daring financial buccaneer," and the doctrine invoked is wholly foreign to the issues.

The judgment in favor of the bank for the value of the cotton sued for in the first twelve counts is affirmed, and the judgment in favor of the bank for the value of the 12 bales sued for in the 13th count is reversed, and judgment entered here for the proper sum.

Mr. Justice HART, having presided in the chancery court, was disqualified, and did not participate herein.