LEWIS POULTRY COMPANY

*vs.*

NEW YORK CENTRAL RAILROAD COMPANY

and

MAINE CENTRAL RAILROAD COMPANY, Trustee.

Androscoggin.    Opinion December 12, 1914.

*Common carriers.   Carmack Amendment.   Rule before enactment of Carmack Amendment permitting common carriers to limit liability over their own lines.   Rights of shipper under Carmack Amendment to bring action against any of the carriers of an interstate shipment.*

Plaintiff's employe forwarded to them at New York City from Batavia, Iowa, a car of bagged hickory nuts.   Shipment was made by the Chicago, Burlington & Quincy Railroad as initial carrier.   In due course, the shipment reached destination, the car intact as the first carrier had sealed it, over the line of the principal defendant, the New York Central Railroad Company, as terminal carrier.   Claiming a loss of 142 bags of nuts, plaintiffs sued the latter, counting on default of its responsibility as a common carrier of goods.

*Held:*   The accountableness created by the Congress of the United States, on the part of the initial carrier of goods in interstate commerce, does not preclude the right to enforce responsibility against the particular carrier on whose line loss, damage, or injury was occasioned.   Indeed, the statute expressly preserves such right.   To maintain the action, when the suit is against other than the initial carrier, the evidence must establish the fact not merely that there was loss, damage, or injury to the shipment in the course of its transportation in interstate commerce, but that such loss, damage, or injury was caused by the carrier named as defendant.

Action on the case to recover damages on account of alleged negligence of defendant company.   Defendant filed plea of general issue.   Verdict for plaintiff in the sum of $884.89.   Defendant filed motion for new trial.   Judgment in accordance with opinion.

Case stated in opinion.

*Jacob H. Berman, and Benjamin L. Berman,* for plaintiff.

*H. P. Sweetser, and Dana S. Williams,* for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, DUNN, MORRILL, JJ.

DUNN, J.   October 19th 1915, I. Rosenfield and Isaac Lewis were copartners, and doing business under the firm name and style of Lewis Poultry Company.   On that day an employe of theirs shipped to them at New York City, from Batavia in the State of Iowa, a car of bagged hickory nuts.   Shipment was made by the Chicago, Burlington & Quincy Railroad as initial carrier.   It reached destination, in the original car, under unbroken seal protection, over the line of the defendant, the New York Central Railroad Company, as terminal carrier, at ten o'clock at night on the 31st day of the same month.   The car was unloaded and delivery of the consignment made on the very next day.

The issue of this case as it was tried, may be compressed into the compass of the question:   In the beginning, how many bags of nuts were intrusted to the railroad at Batavia for carriage?   The plaintiffs say 468.   The defendant replies 326.   Plaintiffs' witness, one Abraham H. Rosenfield, testified that he, in their behalf, purchased the nuts of sundry dealers in and about the Iowa town, and that, from time to time, within a period of three days next preceding the day on which the shipment was made, he loaded 468 bags of nuts into the car.   His count, he continued, was verified by an agent of the railroad company, when and as it was made.   Immediately after it was loaded, the car was sealed.   When this had been done, a straight bill of lading was prepared from a printed form, and issued.   It was signed by the shipper and by the agent of the carrier.   In the bill the shipment is described as 468 bags of hickory nuts, in apparent good order, contents and condition of contents of packages unknown, weighing, subject to correction, 15000 pounds.   On the bill, following description of the goods, as part of its written portion, are the initials O. R. S. L. & C., which another witness, a general foreman for the defendant company, testified on cross examination, against objection, were by usage of particular significance, in the specific line of the business of freight transportation, and which he translated as abbreviations for the words, Owner's Risk, Shipper's Load & Count.   If the initials were within the general information of the court as symbols of ideas adopted by the community generally and forming part of the

language, and they in themselves were plain enough to permit judicial construction, it would be unnecessary to prove their import. *State* v, *Intoxicating Liquors*, 73 Maine, 278. Otherwise it would be competent to do so. In either event the proof would do no harm.

When in the course of its appointed journey, the car had arrived at a place called Weehawken in the State of New Jersey, it was put on board a float and transferred to ultimate destination, the Franklin Street station of the defendant, a dock without trackage, at Pier 23, North River, New York. From the float, as it lay at the pier, the defendant unloaded the car into a shed on the dock. Notice of arrival of the freight was given the self-same agent of the consignees who dispatched the goods originally. He promptly repaired to the station, made payment of the carrying charges, received a bill specifying 468 bags H. Nuts, and sought the freight. Defendant made delivery to him of 326 bags of nuts, and no more. Plaintiffs sued the terminal carrier, declaring on default of its responsibility as a common carrier of goods for the loss of 142 bags of nuts, and adding count in trover. There is dearth of principles and facts on which to found trover. One may lose the goods which he confided to a carrier for transportation, but a loss so sustained has characteristics which differentiate it from all others, as the physical features of a man distinguish him from his neighbors. Cause of action, if there be such, flows from default of the obligation of a common carrier. *Georgia, Florida & Alabama Railway Company* v. *Blish Milling Company*, 241 U. S., 190.

In one way or another, freight shipments have provoked numerous intricate controversies, which the courts have met with decisions, certain of which we epitomize: At the common law, if a common carrier of goods were tendered property to be transported along and beyond his own route or line to a point on the route or line of a succeeding carrier, it would be elective on his part whether to contract to carry safely to destination, or so to carry only over his own route or line, and safely to deliver the property to the next carrier. In the first case, from the very nature of the undertaking, he would agree that from the end of his own line, he would perform the contract through the medium of agents, that is to say, the carriers from the end of his route or line to destination, succeeding and participating in the carriage. And, as the act of the agent, within the scope of his

employment, is that of his principal, the original carrier's responsibility would attend the shipment in undiminished degree from the place where it was made to that at which it was, or should have been, safely delivered to the consignee.   In the other suppositive case, his responsibility as carrier would continue from the place and time that he received the goods to the end of his route or line, where would attach the liability of forwarding them over the connecting route.   A special contract not shown, the law would presume that he bound himself only to carry safely over his own line, and likewise to deliver to the next carrier.   However, being free to contract either way: which contract he made was not infrequently mooted.   If the first, and it were with respect to goods to be carried in interstate commerce, not necessarily as comprehensively as that expression has been defined by the Congress of the United States, but for the purpose of this discussion from a point in one State to a point in another State, it might happen that responsibility for want of befitting discharge of the contract never would be fixed.

Concerning the regulation of interstate commerce, the power of Congress is paramount and plenary.   U. S. Const., Art. 1, Sec. 8, Clause 3.   Until Congress spoke, there was a wide field which it was competent for the several States to occupy with legislation governing commerce national in character, and regulating the subject of its transportation.   Regardless of whether they carried in intrastate or interstate commerce, without agreement between them, and in the absence of legislative regulation, the mere fact that their coaches regularly were driven to the same place, or that their boats plied to the same dock, or that the tracks of their railroads connected, would not establish business or contractual relation between independent carriers.   Legislation regarding the duty of connected railroads began early in the history of their construction, perhaps even earlier in the State of Maine than elsewhere in the Union.   As long ago as 1842 our Legislature enacted a general statute dealing with connected roads (1842, Chap. 9), and in 1854, Chap. 93, a tribunal was established to determine "the terms of connection, and the rates at which passengers and merchandise coming from the one shall be transported over the other."   In these and related respects laws were enacted by the legislatures in other States.   So far as the legislation, passed by the several States in the exercise of the police power, concerned interstate

commerce, it was superseded eventually by acts of Congress, but until made void it controlled. A practical trouble with the legislation of the States was that it lacked uniformity of obligation and of liability. The rules were almost as numerous and as various as the jurisdictions. And judicial decisions were not always in complete accord. Facts on which a carrier might be held liable in one State would exempt him in another. A well-intentioned plaintiff with a good cause of action and in the right court might find himself in the wrong State. Indeed, he might go from commonwealth to commonwealth, and from court to court, to meet defendants each in his turn successfully contending on the ground that loss, injury, or damage, if it had occurred, was from act or neglect not shown to have been his.

In this situation, and as additional to earlier laws by it enacted, Congress legislated on the extent of the liability of an initial carrier of goods in interstate commerce. It importantly changed The Interstate Commerce Act of February 4, 1887 by adding thereto, under date of June 29, 1906, what, in historic and euphonious brevity, has come to be known as the Carmack Amendment. For failure of performance of a contract for the carriage of goods by a common carrier in interstate commerce, that amendment permits the enforcement of responsibility as against the initial carrier, without reference to where in the whole line of transportation the loss, damage, or injury occurred. It imposes on the initial carrier the responsibility of a carrier from the point of shipment to the point of destination, with right of recovery over against the carrier who actually caused the loss. It makes the initial carrier contract as though he owned and operated a continuous line from the point of shipment to that of destination. It creates the relation of principal and agent between the initial carrier and other carriers participating in the carriage; and makes the former contract safely to carry the goods with carrier's liability through to the end of the line, even into the warehouse at destination, and beyond that safely to deliver the goods to the consignee. *Atlantic Coast Line Railroad Company* v. *Riverside Mills,* 219 U. S., 186; *Northern Pacific Railway Company* v. *Wall,* 241 U. S., 97; *St. Louis, Iron Mountain & Southern Railway Company* v. *Starbird,* 243 U. S., 593; *Ross* v. *Maine Central Railroad Company,* 112 Maine, 63; *Southern Railroad Company* v. *Prescott,* 240 U. S., 632; *Briggs Hardware Company* v. *Aroostook Valley Railroad Company,* 117 Maine, 321.

The liability thus imposed is inclusive of that which is caused by neglect as well as of that caused by positive act.   As Chief Justice Knowlton aptly wrote:   "One obvious purpose of Congress was to extend the provisions of the common law so as to make a common carrier receiving property for transportation liable for loss, damage, or injury to it, not only while it is in transit over his own lines, but while it is in the hands of a connecting carrier.   .   .   .   Although the liability stated is made statutory by the enactment, the statement of it, in the words 'for any loss, damage, or injury to such property caused by it or by any common carrier, railroad or transportation company to which such property may be delivered or over whose line or lines such property may pass,' includes nothing beyond the liability at common law, except that for the undertaking of other carriers into whose possession the property may come.   .   .   .   The liability stated is for every kind of positive misconduct of the carrier affecting the property, and for negligence from lack of care or effort."   *Bernard* v. *American Express Company,* 205 Mass., 254.

But the accountableness created by Congress on the part of the initial carrier does not preclude the right to enforce responsibility against the particular carrier, whether initial, intermediate, or terminal, on whose line the loss, damage, or injury was occasioned.   Such right of action the statute expressly preserves.   *Kansas City Railway Company* v. *Carll,* 227 U. S., 369.   See, too, *Hayden* v. *Maine Central Railroad Company,* 117 Maine, 560.   And the bill of lading, symbolic representative of the goods it itself describes, which it is mandatory on the initial carrier to issue, in its valid, applicable terms governs the entire transportation.   *Georgia, Florida & Alabama Railway Company* v. *Blish Milling Company,* 241 U. S., 190; *Missouri, Kansas & Texas Railway Company* v. *Ward,* 244 U. S., 383.   In so far as the bill of lading admits the quantity, the quality, or the condition of the goods at the time that they were delivered to the initial carrier, certainly as between the parties, it is a mere receipt, constituting an admission, not necessarily conclusive, which may be explained or contradicted by parol; but respecting the transportation and delivery of the goods it is evidence of a contract of affreightment that must be construed according to its terms.   *Pollard* v. *Vinton,* 105 U. S., 8; *O'Brien* v. *Gilchrist,* 34 Maine, 554; *Witzler* v. *Collins,* 70 Maine, 290.   The receipt of the goods lies at the foundation of the

contract to carry safely and deliver. If no goods were received by the carrier, albeit a bill of lading outstand, there could be no valid contract to carry safely and deliver; and such bill would be void even in the hands of a transferee in good faith and for value. *Pollard* v. *Vinton,* supra. If, by mistake or otherwise, more goods were receipted for than received, it would be competent for appropriate explanation to be made. *Pollard* v. *Vinton,* supra; *O'Brien* v. *Gilchrist,* supra; *Witzler* v. *Collins,* supra; *Arthur et al.* v. *Texas & C. Ry. Co.,* 139 Fed., 127; *Cohen Bros.* v. *Missouri & C. Ry. Co.,* 98 S. W. 437; *St. Louis & C. Ry. Co.* v. *Citizens' Bank,* 112 S. W., 154.

The question about which all the facts of this case center and cluster, and the answer to which shall determine the legal rights of the parties, recurs: How many bags of hickory nuts did the plaintiffs commit to the initial carrier for transportation? No other inquiry, as the case shapes, is germane. The car in which the shipment was made came to destination, so far as outward appearance was concerned, precisely as it left the starting point. About that there is no question. There had been no opportunity for loss or abstraction of any part of the load while the car was on the way. Thieves had not broken in and stolen. It had not been entered by anybody. It was intact as the Chicago, Burlington & Quincy Railroad sealed it, in the presence of the plaintiffs' witness, within five minutes after it was loaded. If the loading count was verified, as the witness testified that it was, by the agent of the Chicago, Burlington & Quincy, that agent did not testify either personally or by deposition. The bill of lading which he as agent issued bears on its face, in characters written by a pen that his hand guided, the monitory, exoterical inscription S. L. & C., signifying that the shipper's representation in that behalf formed the basis of recitals with respect to load and count. True the bill is to be construed strictly as against the carrier. Carriers issue such largely as a matter of business routine. At times, in the rush of traffic or for other reason, adequate opportunity is not always afforded the shipper to define or impress his view. Courts hold that the shipper may insist upon verification of his count and load. The Willie D. Sandoval, 92 Fed., 286. Here the plaintiffs say that the carrier counted the load; that its count agreed with that of their own man; and yet defendant's agent, in the exercise of an excessively abundant caution, when he made out the bill of lading, restricted it

as to load and count to the shipper's representations. And he underestimated by 19500 pounds the weight of the load that it is insisted he had personally counted! Mr. Abraham H. Rosenfield's testimony that he had and made delivery to the carrier of 468 bags of nuts stands alone. There are no corroboratory facts, excepting the quantity restricted bill of lading and the freight bill. The latter bears inherent evidence that it was prepared from the bill of lading. That the charges for carrying were paid on arrival of the goods is not of potency greater than prepayment for the transportation of the freight would have been. The plaintiffs' case must stand or fall on the testimony of Mr. Rosenfield, the man who loaded the nuts, who as shipper signed the bill of lading with its material limitation, and did not protest; and who received delivery of the goods at destination.

For the defendant it appears: The car aboard, the float which was towed from the New Jersey shore was made fast to the New York pier; a shed covered the dock save that, on the river projecting end, there was a space about two feet in width, presumably about as long as the dock was wide, on which the floatmen walked when they fastened their boats to the wharf; from the shed this space was accessible only from the tug dispatcher's office; seal protection of the car on its arrival was complete. It was opened and unloaded into the shed, where watch and ward was kept, and men not there habitually employed had admittance only by pass. Employees of various grades had to do with the freight, each independently of the other. The freight was counted as it came from the car. Excepting as he found it, the man who counted out the load, was not advised as to the quantity of freight supposed to be in the car. He made written report of his count to a verifying clerk, to whom also came report from the man who made delivery of the goods to the consignees. When the reports were compared with a record already filed with the verifying clerk, a "shortage" was indicated; fewer bags of nuts were found in the car than the way-bill and bill of lading called for. But the record with which the reports were compared, in fairness it should be remembered, was based on the representation of the plaintiff's servant and witness, concerning the quantity of the load, to the agent in Batavia when the nuts were shipped.

Which count, all things considered, was the more accurate?   That made by Mr. Rosenfield when he, at intervals of time, in the course of two or three days, loaded the nuts into the car at Batavia, as he purchased them in small lots from dealers there and thereabouts, or that of the defendant, under its system of checks and balances, as the freight was unloaded from the car into the shed a plank's length away, and again as delivery was thence made to the consignees.   The quantity of nuts shipped, the quantity received, the quantity, if any, that was lost, and if lost, whether by the positive act or neglect, not of some carrier in the course of the transportation, but whether by the act or neglect of the defendant on its line, for this suit is not against the initial carrier, were questions of fact for the jury.   The decision of the jury counts for much.   It is not to be lightly annulled.   But weighing the evidence in cold, calculating, unimpassioned manner, it is our conclusion that the jury misapprehended the evidence, and from it drew inferences so erroneous as to make it the clear duty of the court to set the verdict aside.

*Motion sustained.*
*New trial granted.*