[Civ. No. 3262. Third Appellate District.—July 1, 1927.]

O. BEDIG, Appellant, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Respondents.

326

Edward Schary for Appellant.

Power & McFadzean and J. Thos. Crowe for Respondents.

THOMPSON (R. L.), J., *pro tem.*—This is an appeal from a judgment for defendants, in an action for alleged conversion of two carloads of grapes, shipped from Kings County, over the Southern Pacific Railroad, and originally consigned to the Bedig Produce Company at Chicago. The defendants deny that plaintiff was the owner of the grapes, and upon the contrary allege that they were owned by the Reliance Fruit Company, and were billed in the name of plaintiff by agreement as a matter of accommodation, and reconsigned

to the purchaser California Growers & Shippers of Fresno, by H. J. Ellis, as the agent of plaintiff and delivered to John A. Eck Company at Chicago.

The plaintiff contends that the findings and judgment are not supported by the evidence; that the court erred in admitting oral evidence of the authorization for the transfer of the bills of lading; and that inconsistent defenses are not separately stated in the answer.

In part the court found: "That the plaintiff did not hire or employ defendants . . . to transport . . . either of the carloads of grapes mentioned in plaintiff's complaint. . . . That it is not true that said carloads of grapes were . . . the property of plaintiff, but on the contrary were the property of said Reliance Fruit Company, composed, owned, operated and managed by said H. J. Ellis, . . . and that said request that said bills of lading should be issued in plaintiff's name as aforesaid, was made through the said H. J. Ellis, and was made in pursuance of an agreement or understanding theretofore entered into between said Reliance Fruit Company and said H. J. Ellis on the one hand, and said plaintiff on the other. . . . That said H. J. Ellis was authorized and empowered to endorse, transfer and deliver said bills of lading. . . . That the said Reliance Fruit Company and H. J. Ellis did sell said carloads of grapes to . . . the California Growers and Shippers, and that said H. J. Ellis did endorse, transfer and deliver said bills of lading to said California Growers & Shippers, which in turn sold said carloads of grapes, while the same were in transit . . . to a certain concern in Chicago known as John A. Eck Company, . . . and said defendants did deliver both of said carloads of grapes at their destination . . . to said John A. Eck Company. . . . "

During the season of 1921, the plaintiff was engaged as sole owner, in buying, and shipping grapes in the county of Kings under the firm name of Bedig Produce Company. At the same time H. J. Ellis was also engaged at Fresno in the same business, as sole owner, under the firm name of Reliance Fruit Company. Ellis had a contract to furnish the California Growers & Shippers with twenty carloads of muscat grapes. At the same time he was under contract to supply plaintiff with ten carloads of the same variety of grapes. The last-mentioned ten carloads were

covered by two written agreements in the following language:

"Fresno, California, Sep't 22, 1921.

"This is to certify that the Reliance Fruit Company has sold, and the Bedig Produce Company has bought five cars of first crop muscats out of the Lamoore district at fifty-four dollars per ton loaded. A deposit of $150 a car is hereby acknowledged,—total $750, balance to be paid upon presentation of bill of lading to O. Bedig at Fresno, Cal.

"(Signed) RELIANCE FRUIT COMPANY,

"By H. J. ELLIS, Agt.

"BEDIG PRODUCE COMPANY, O. BEDIG."

In fulfillment of these contracts, Ellis obtained the cars of the Southern Pacific Company, and loaded them, procuring the bills of lading to be issued in the names of the purchasers. Usually the grapes intended for plaintiff were billed in the name of Bedig Produce Company, as consignor, and directed to the same firm, as consignee, at Chicago. The carloads which were delivered to the California Growers & Shippers were similarly billed with this purchaser's name appearing in the bill of lading as both consignor and consignee. Standard bills of lading were issued by the transportation company in triplicate, the first copy being termed the original, the second was called a duplicate, and the third was a mere memorandum which was retained by the railroad company. Both the original and duplicate bills of lading were given to Ellis and turned over to the purchaser upon delivery of the grapes when the cars were ready to roll. Plaintiff had nothing to do with the loading or billing of these cars.

The rule of the railroad company required the prepayment of freight charges, but in lieu thereof, a bond was required of the shipper guaranteeing the payment of freight before the cars were supplied. The plaintiff had such a bond deposited with the defendant railroad company covering the Lamoore station from which the grapes in question were shipped. Pursuant to an oral agreement the ten carloads of grapes for which plaintiff contracted were to be loaded and delivered to him at Lamoore at the rate of one carload every day, or every other day, at request. In this manner eight of the cars were loaded and delivered to plaintiff, and are not involved in this action. Although a

conflict of evidence exists, there is substantial testimony to the effect that some of the carloads of grapes which were sold to purchasers other than the plaintiff, as a matter of accommodation, were billed in the name of Bedig Produce Company, for the reason that the Reliance Fruit Company had no sufficient bond on file with the railroad company. And it appears that the plaintiff had authorized this practice together with the necessary indorsement of transfer, and the signing of his company name on the bills of lading, when the carloads were delivered or reconsigned in transit. This agreement was not in writing, and evidence of this oral agreement was received over plaintiff's objection.

Mr. Ellis, the owner of the Reliance Fruit Company, testified that after eight carloads of grapes had been loaded and delivered to the plaintiff, he was told by plaintiff that he was delivering the grapes too fast, and that he wished him to hold the remaining shipment back somewhat; that the last two carloads involved in this suit were loaded and billed to the Bedig Produce Company; that the bills of lading were delivered to him (Ellis) by his representative, Alexander, and that on account of said instructions from plaintiff, he (Ellis) had thereupon diverted and transferred the carloads of grapes to the California Growers & Shippers, and had assigned the bills of lading in his own handwriting, indorsing them "Bedig Produce Company, by H. J. Ellis."

With relation to this authority to load and bill the grapes in the name of Bedig Produce Company, and thereafter assign the bills of lading, Mr. Ellis testified: "I informed Mr. Bedig we had no shippers bond on the Southern Pacific lines, and would like very much to use his bond for the shipment of fruits over the Southern Pacific in that district for that season. He stated that that would be perfectly all right, as he had no shipments going forth from that section. . . . He told me I could endorse the bills of lading, Bedig Produce Company by myself, and that would be perfectly all right. . . . We loaded the cars and billed the cars under Bedig Produce Company, and presented the bills of lading to Mr. Bedig, and received his check for them as loaded, less deposit. . . . We commenced delivery of the second series immediately after the first five were filled, and he came to our office at one time and said that

we were shooting them a little too fast for him. . . . We had one particular car of fruit . . . he stated it was too heavy for him to use, and I turned that car over to a broker to dispose of. . . . We were also filling Mr. Satrakian's order at the same time, . . . We supplied him two cars on an old Bedig bond, same being endorsed 'Bedig Produce Company, by myself,' . . . under authority received by Mr. Bedig, and witnessed too.'' About October 18th or 20th, Ellis had a conversation with plaintiff about this matter, regarding which he testified: ''Mr. Bedig came in and stated that we had delivered two bills of lading to the California Growers & Shippers, and he didn't want (them) to have any cars whatever billed on his bond. Anyone else was perfectly all right, but Mr. Satrakian, the manager, . . . and himself were not on speaking terms, and were not good friends, and consequently they could not have any fruit billed on his bond.'' On cross-examination, the following occurred: ''Q. Well, his authority to you was unqualified, was it, that you could take whatever cars he had, consign them by him to himself, have the bill of lading issued to Mr. Bedig, and you could endorse his name on the back of it, by yourself, and it would be perfectly all right? A. Absolutely. Q. And you did that? A. Yes. Q. In two instances, is that right? A. In three instances.''

Two other witnesses, namely, Condry and Augustus, corroborated the claim of Mr. Ellis that plaintiff had authorized the billing of cars in the name and under the bond of plaintiff. After assigning and transferring the bills of lading of the two carloads involved in this action, to the California Growers & Shippers, the last-mentioned company reconsigned them and they were forwarded and delivered to John A. Eck Company of Chicago. Some three days after Ellis delivered the bills of lading of these two cars to the California Growers & Shippers, plaintiff came to see Ellis and registered a vigorous protest against this particular sale. The plaintiff was very angry, and in order to placate him, Ellis procured a return of the duplicate bills of lading and delivered them to him without telling him that the California Growers & Shippers had already diverted and reconsigned the cars to purchasers at Chicago. Upon delivery of these two duplicate bills of lading, the plaintiff offered, and Ellis accepted his check for

$1,165.55, the balance of the purchase price of the two carloads of grapes. Somewhat later Ellis offered to supply plaintiffs with two other carloads of grapes in lieu of these two in question, which the plaintiff refused to accept. Ellis also offered to repay plaintiff the entire purchase price of said two carloads of grapes, which was likewise refused. After receiving the duplicate bills of lading from Ellis, plaintiff tried to divert and reconsign the two carloads of grapes to a purchaser at Jersey City, but was unsuccessful, for they had been delivered under the transferred original bills of lading to John A. Eck Company, at Chicago. Thereupon this action was commenced, and defendants had judgment in the court below.

The chief question involved in this case is whether the defendant railroad company was guilty of conversion for failure to deliver the two carloads of grapes at their destination to the original consignee named in the bill of lading. If the title to the grapes had not passed to plaintiff, and Ellis had the authority to bill these cars in the name of plaintiff, and transfer the bills of lading as the agent of plaintiff, then the defendant is not liable.

■ Appellant relies upon certain sections of the Civil Code of California, which, it is claimed, governs the effect of bills of lading, and fixes the liability of transportation companies for failure to deliver freight. But, since this case clearly involves a transaction governed by interstate commerce, these sections of the state law do not apply. The transportation of grapes by a carrier from Kings County, California, to Chicago, Illinois, is clearly within the Interstate Commerce Act enacted by Congress pursuant to the provisions of article I, section 8, of the federal constitution. (5 R. C. L. 713, sec. 25; 12 C. J. 22, sec. 22.)

■ Congress has exclusive authority to regulate interstate commerce under the federal constitution. (1 Const. & Courts, 447, 449, 459; 5 R. C. L. 715, secs. 26, 27; 12 C. J. 86, sec. 14.) "The power of Congress to subject every carrier engaging in interstate commerce to the regulations which it has adopted is undoubted. Such regulations as Congress may lawfully prescribe or authorize, and which may properly be deemed in regulation of interstate commerce, are paramount. . . . The states have no power to present any obstacle or lay any burden upon interstate

transportation (except when the) subject matter is a proper police regulation." (5 R. C. L. 715.) " . . . The liability of a common carrier for loss, damage or injury to an interstate shipment, as well as the validity of a stipulation in the contract of carriage relating to liability, is exclusively a federal question to be determined by reference to the federal statutes and decisions." (12 C. J. 86.) "Commerce, which consists of the transportation of persons and property between the states, is a subject of national character, and requires uniformity of regulation. Congress, alone, therefore, can deal with such transportation; its nonaction is a declaration that it shall remain free from the burdens imposed by state legislation. Otherwise there would be no protection against conflicting regulations of different states, each legislating in favor of its own citizens and products, and against those of the other states." (1 Const. & Courts, 449; *Gloucester Ferry Co.* v. *Penn,* 114 U. S. 204 [29 L. Ed. 158, 5 Sup. Ct. Rep. 826, see, also, Rose's U. S. Notes]; *Welton* v. *Missouri,* 91 U. S. 280 [23 L. Ed. 347].)

▇ The bills of lading involved in this action, and the transfer thereof, must be governed by the federal laws, and not by our local statutes. They were "straight, nonnegotiable bills of lading," and were so marked upon their face. Having been consigned to specified persons, these bills were what Congress has termed "straight bills," as distinguished from "order bills."

By an act of Congress adopted August 29, 1916, chapter 415, Sup. of 1918, Fed. Stats. Ann. 73, it is provided, in part: "Sec. 2. A bill in which it is stated that the goods are consigned or destined to a specific person is a straight bill." Section six of that act provides: "A straight bill shall have placed plainly upon its face by the carrier issuing it, 'non-negotiable,' or 'not negotiable.'" Section eight holds that "A carrier in the absence of some lawful excuse is bound to deliver goods upon a demand made either by the consignee in the bill for the goods, or, if the bill is an order bill, . . . " etc. Section nine provides that "A carrier is justified . . . in delivering goods to one who is, (a) A person lawfully entitled to the possession of the goods, (b) The consignee named in a straight bill for goods, or (c) A person in possession of an order bill, . . . " etc. Section ten provides that, "Where a carrier delivers goods

to one who is not lawfully entitled to the possession of them, the carrier shall be liable to anyone having a right of property or possession in the goods if he delivered the goods otherwise than as authorized by subdivisions (b) and (c) of the preceding section. . . . " And section twenty-two of that act provides that, "If a bill of lading has been issued by a carrier, or on his behalf by an agent . . . the carrier shall be liable to (a) the owner of the goods covered by a straight bill subject to existing right of stoppage *in transitu,* or (b) the holder of an order bill . . . " etc.

 It will be observed that there is nothing in the foregoing act which prohibits the transfer or assignment of a bill of lading. Since Congress has fully legislated on the subject of the effect of bills of lading, and has omitted to prohibit such transfers, we must assume that a transfer or assignment of bills of lading, either by a principal or agent is authorized. "Where the power of Congress to regulate is exclusive, the failure of Congress to make express regulations indicates its will that the subject shall be left free from any restrictions or impositions; and any regulations of the subject by the states, except in matters of local concern only, is repugnant to such freedom." (1 Const. & Courts, 459.)

From the foregoing portions of the federal bill of lading act, it appears that a carrier is justified in delivering goods (a) to the person lawfully entitled thereto, or (b) to the consignee named in a straight bill of lading; and where a carrier delivers goods to one who is not lawfully entitled to them, he is liable only to (a) the owner of the goods, or (b) the one having the right of possession of the goods.

 The record in the instant case furnishes substantial evidence to the effect that plaintiff, at the time of the alleged conversion, was neither the owner of the two carloads of grapes in question, nor entitled to their possession. Appellant relies upon the fact that having contracted with Ellis for ten carloads of grapes, that since the last two cars were actually loaded by the vendor, and billed in plaintiff's name, that therefore title had passed to him, and he thereby became the owner. However, it appears that at the same time Ellis was loading similar grapes at the Lamoore station and billing them to other buyers. He has been in-

formed by plaintiff that he was delivering the cars too fast. Substantial evidence indicates that Ellis was authorized by plaintiff to load and bill cars for other purchasers on plaintiff's bond, and thereafter assign the bills of lading. Plaintiff had no part in either the loading or the billing of the cars. ▆ The contracts of purchase were very meager indeed, and furnish little evidence as to when the parties intended title to the grapes in question to pass. These memorandums recited that "Reliance Fruit Company has sold, and Bedig Produce Company has bought," ten carloads of grapes. A deposit of $150 per car was made on this purchase. No grapes from any particular field were specified, and no time for delivery was mentioned. The final payment was to be made "upon presentation of the bill of lading to O. Bedig." Considering this memorandum of purchase in connection with all the other facts and circumstances surrounding the transaction, it appears to have been the intent of the parties that the title to the grapes was to pass upon the delivery of the bills of lading to the purchaser. ▆ On account of plaintiff's instructions to Ellis that he was delivering the cars too fast, he assigned the bills of lading and delivered them to his other customer, the California Growers & Shippers, who, in turn sold and reconsigned them to John A. Eck Company at Chicago. Whatever may have been the motive or purpose of Mr. Ellis in subsequently procuring the duplicate copies of the bills of lading, and delivering them to plaintiff, and accepting the balance of the purchase price for the two remaining carloads of grapes which he had agreed to furnish plaintiff, his conduct in no way affected the title to the grapes which had already passed.

But appellant contends that oral evidence of the alleged authority of Ellis to transfer the bills of lading from plaintiff to another customer, under the provisions of section 2309 of the Civil Code, was incompetent.

▆ Primarily, a bill of lading is in the nature of a receipt for goods on the part of the carrier, and is presumptive evidence, only, of the ownership thereof. ▆ As between the parties it is impeachable for mistake, error, or false statements contained therein. (4 Elliott on Railroads, 3d ed., 497, sec. 2135; *St. Louis I. M. & S. R. Co.* v. *Citizens Bank of Little Rock,* 87 Ark. 26 [112 S. W. 154]; 4 Jones' Com-

mentaries on Evidence, 3030, sec. 1652.) ▉ But a bill of lading may also become a contract between the shipper and the carrier for the transportation and delivery of the goods to the owner or the consignee. (4 Elliott on Railroads, 497, sec. 2135.) The last-mentioned citation contains this statement, "In so far as it is merely a receipt, either party may explain or contradict it by parol, but as a contract it must be construed according to its terms." And on page 527 of the last authority cited, it is said: "Bills of lading are not negotiable at common law as commercial paper. . . . They are, however, assignable, and in a larger than usual sense insomuch as their assignment ordinarily constitutes a complete legal delivery of the goods." (*Didge* v. *Meyer*, 61 Cal. 405.)

▉ The oral evidence objected to in the instant case was not offered to vary the terms of the written bill of lading; nor was it offered to show the authority to sell and convey property, but it was received solely to establish an alleged agency to load and bill cars on plaintiff's bond and in his name, and to transfer the bills of lading therefor. We are of the opinion that parol evidence is competent for this purpose. ▉ There is no inhibition of the federal law to this effect. It was held in *Kemper Mills, etc.,* v. *Hines,* 293 Mo. 88 [239 S. W. 806], that the agency of a consignee authorizing him to receive delivery of goods need not be in writing. It is there said, "In such a case would the consignor's authority to his agent to receive the delivery of the goods be required to be in writing? . . . We think not. We know of nothing in the act of Congress, or other statutes so requiring. The fact that the bill of lading itself is required to be in writing does not require the authority of the agent receiving the property thereunder to be in writing." In 4 Jones' Commentaries on Evidence, 2847, sec. 1557, it is said: "Notwithstanding the rule of law that an agreement reduced to writing may not be contradicted or varied by parol it is well settled that the principal may show that an agent who made a contract in his own name was acting for him. This proof does not contradict the writing; it only explains the transaction. . . . Agency may always be proved for the purpose of binding the principal, or for the purpose of giving the principal the benefit of the contract." And in 4 Elliott on Railroads, 505, sec. 2139,

the following language is used, ''Bills of lading are only *prima facie* evidence between the original parties that the goods have actually come into the carrier's custody, and like other receipts are open to explanation or contradiction by parol.''

Nor does the answer set up inconsistent defenses. After admitting the agreement to sell plaintiff ten carloads of muscat grapes defendants categorically deny all the other material allegations of the complaint, and allege that the Reliance Fruit Company, and not the plaintiff, was the owner of the particular carloads of grapes involved in this action.

The findings are sufficiently supported by the evidence, and no reversible error appears in the record. For the foregoing reasons the judgment is affirmed.

Plummer, J., and Finch, P. J., concurred.